## A03A1777. BOWEN & BOWEN CONSTRUCTION COMPANY v. FOWLER.
### (593 SE2d 668)

ANDREWS, Presiding Judge.

Evelyn Fowler bought a house from Bowen & Bowen Construction Company (Bowen). Before closing, Fowler and a Bowen representative did a walk-through of the house and made a "punch list" of items that Bowen agreed to correct or repair. One of these punch list items was standing water in the backyard. Bowen never corrected the problem, and after almost two years, Fowler sued. A jury awarded Fowler $100,000 in compensatory damages, $33,000 in attorney fees, and $500,000 in punitive damages.[1] Finding no error, we affirm this judgment.

The evidence at trial, taken in the light most favorable to the verdict, was that when Fowler decided to buy her lot from Bowen, the backyard was flat. At some point after Fowler signed the contract for construction of the house, Bowen graded the lot and took dirt from Fowler's yard and put it on a nearby lot owned by Mike Moulder, a Bowen employee.

Before closing, Fowler walked through the house with Steve Moulder and they compiled a "punch list" of items that Bowen agreed to fix. Fowler pointed out that there was standing water in the backyard and this was added to the punch list. After being told that the punch list items would be corrected, Fowler closed that afternoon.

Bowen did not correct the standing water problem as promised. There was evidence of numerous complaints from Fowler over a period of almost two years. According to Fowler, the water from surrounding houses all drained into her yard, and because of the grading that had been done, collected there, with no way to drain out. Despite the fact that one of Bowen's work orders had noted on it "yard is really flooded," Bowen never made any meaningful effort to correct the problem. At one point, Bowen put down some sand and also some sod, but this did not help. The Bowen employees who testified at trial all stated that they did not believe there was a "problem," but they never informed Fowler of this. Finally, Fowler gave Bowen a videotape of the flooded backyard. After keeping the video for several

---

[1] This amount was reduced to $250,000 pursuant to the statutory cap of OCGA § 51-12-5.1 (g).

weeks, Branch, a Bowen employee, gave it back to Fowler. When she asked him what they were going to do, he said "nothing." Branch told her to "get an arbitrator."

At trial, Fowler submitted ten videotapes, starting in August 1998, and going through January 19, 2002. The tapes showed large areas of standing water in her backyard. She said that at one point she had the whole backyard sodded at her own expense because Mike Moulder told her she should, but that did not correct the problem. She said that after a rain, the water could be as much as a foot deep and would stand for two or three days and then the ground would be muddy for a long period after that.

Fowler's expert witness testified that the lot was improperly graded almost like a "bowl" and that water flowed from the top of the street down to Fowler's backyard. He said that after a rain, the standing water could be as much as a foot deep. He stated that the water did not disperse and was still there more than 48 hours later. The expert said he had installed four large drains in Fowler's backyard at a cost of $5,770.

Fowler stated that even though she had drains installed at her own expense, her grandchildren and great-grandchildren cannot play in the backyard because of the large drains. Because the water stays in the drains for long periods of time, it is a breeding ground for mosquitos. Also, because water drains into her yard from several other yards, she has debris in the yard, and she knows the house will be difficult if not impossible to sell because of the four drains and the runoff problem.

Despite the evidence from the videotapes and pictures, the Bowen employees who testified continued to deny there was any problem with water in Fowler's yard. One Bowen employee said that he put some sod down in Fowler's backyard and he was pleased with the result and believed that this corrected the problem.

Although Bowen did not submit any expert testimony to refute the testimony of Fowler's expert or to support the testimony of its employees, the jury heard evidence that Bowen had hired an expert who studied Fowler's property and made a report. But, Bowen did not use the report or call the expert at trial.

The judge charged the jury on fraud, continuing nuisance, and breach of contract, and the jury returned a verdict for Fowler in the above-stated amounts. This appeal followed.

1. Although this Court denied its application for interlocutory appeal on this issue, Bowen again argues that Fowler was required to arbitrate her claims. We disagree.

In the purchase agreement, the parties expressly agreed that arbitration would be voluntary and only if both parties agreed to it. But, at closing, Bowen gave Fowler a "2-10 Home Buyers Warranty,"

that provided that "[a]ny and all claims, disputes and controversies arising under *or relating to* this [2-10 Home Buyers Warranty] . . . shall be submitted to arbitration by and pursuant to the rules of Construction Arbitration Services, Inc." The warranty also stated that arbitration was only applicable to "claims, disputes and controversies arising under or related to this Agreement." Expressly excluded from warranty protection was any item that was included on the punch list.

The punch list, therefore, is not a part of the warranty agreement and the trial court correctly concluded that Fowler was not compelled to arbitrate. Because Fowler did not sue Bowen under the 2-10 Home Buyers Warranty and because she did not agree to arbitrate the claims, the trial court correctly denied Bowen's motion to compel arbitration.

2. Next, Bowen claims the trial court erred in denying its motion for directed verdict on Fowler's fraud claim.

> Where a jury returns a verdict and it has the approval of the trial judge, the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence. The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, the denial of defendant's motion for directed verdict, new trial and [judgment notwithstanding the verdict] will not be disturbed.

(Citation and punctuation omitted.) *Gantt v. Bennett*, 231 Ga. App. 238, 240 (499 SE2d 75) (1998).

In order to prove fraud, a plaintiff must show: (1) false representations; (2) made with knowledge of the falsity of the representation; (3) made with the intent to induce the plaintiff to act or to refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damages proximately caused by such reliance in the representation. *Smiley v. S & J Investments*, 260 Ga. App. 493, 499 (580 SE2d 283) (2003).

Here, the evidence was that Bowen knew prior to closing that there was a problem with water drainage in Fowler's backyard and undisputed evidence that Bowen took dirt from Fowler's yard to fill in an employee's lot. During the walk-through prior to closing, Bowen promised to take care of the standing water problem in Fowler's yard and Fowler closed on the house that afternoon. After almost two years, a Bowen employee informed Fowler that they had no intention

of doing anything about the problem. There was no evidence that Fowler should have known Bowen was making false representations to her and undisputed evidence of damages as a result. Accordingly, the trial court did not err in denying Bowen's motion for directed verdict on Fowler's fraud claim. *Bowdish v. Johns Creek Assoc.*, 200 Ga. App. 93, 96 (406 SE2d 502) (1991); *Rogers v. deMonteguin*, 193 Ga. App. 480, 482 (388 SE2d 10) (1989).

3. Bowen also contends the trial court erred in entering judgment on Fowler's claim for punitive damages. Under OCGA § 51-12-5.1 (b), punitive damages may be awarded in a tort action if the plaintiff proves by clear and convincing evidence that "the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences." *Segars v. Cleland*, 255 Ga. App. 293, 296 (564 SE2d 874) (2002).

In the punitive damages phase of the trial, Fowler produced evidence that numerous other homeowners had complained about standing water and water drainage problems and Bowen was aware that this was a major problem in the subdivision. There was evidence that Bowen used their Home Buyers Warranty to evade fixing these problems and also to force homeowners into arbitration and prevent them from filing claims. Also, despite knowledge of the drainage problems, Bowen nevertheless took dirt from Fowler's yard and put it on a lot owned by one of its employees. Bowen consistently refused to acknowledge the problem and its employees testified at trial that they did not believe anything was wrong and if they had it to do over again they would not change a thing. Further, there was evidence of the physical toll this problem had taken on Fowler, who was 79 years of age at the time of trial. Accordingly, we conclude that there was clear and convincing evidence from which the jury could conclude that punitive damages should be awarded in this case.

Nor do we find the award was excessive. In reviewing punitive damage awards, courts are required to consider three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (Citation omitted.) *State Farm &c. Ins. Co. v. Campbell*, 538 U. S. 408 (123 SC 1513, 1520, 155 LE2d 585) (2003) (quoting *BMW of North America v. Gore*, 517 U. S. 559, 575 (116 SC 1589, 134 LE2d 809) (1996)). "The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." (Citation and punctuation omitted.) Id. at 1521. In determining the reprehensibility of the defendant's actions, courts must consider whether: "the

harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." (Citation omitted.) Id. Here, Fowler presented evidence of physical and economic harm, the conduct was repeated, not an isolated incident, and it was intentional.

Looking at the second *Gore* guidepost, we note that the Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." (Citation omitted.) *State Farm*, supra at 1524. The Court has stated, however, that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process" and "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." (Citation omitted.) Id.

In this case, compensatory damages were $100,000 and punitive damages awarded were $500,000. This award has already been reduced to $250,000 pursuant to the statutory cap. See OCGA § 51-12-5.1 (g). Accordingly, the ratio is within the *Gore* guideposts.

As to the third guidepost, civil penalties authorized for this conduct, the Georgia Fair Business Practices Act authorizes treble damages for each intentional violation. OCGA § 10-1-399 (c). Accordingly, we find the punitive damages awarded were not excessive, especially in light of their purpose which is to punish the defendant company and deter that company and other companies from engaging in these practices in the future. *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U. S. 1, 20-21 (111 SC 1032, 113 LE2d 1) (1991).

Bowen also argues that the wealth of the defendant cannot justify an otherwise unconstitutional punitive damages award. It cites to testimony showing that Millard Bowen, the sole shareholder and president of the company was paid $1.5 million in salary in the past year and that the company also made a profit of $1.5 million that year. Because we have held that the award of punitives was not unconstitutional, we need not consider this argument.

4. Bowen's claim that the trial court erred in allowing introduction of its letter to Fowler threatening her with a suit for abusive litigation if she pursued her claim is without merit. The letter was not introduced until the third phase of the trial, the determination of the amount of punitives, and then only in rebuttal to testimony from a Bowen employee purporting to show remorse over the way the company treated Fowler. See OCGA § 24-9-82. Accordingly, there was no abuse of discretion in admitting the letter into evidence.

*Judgment affirmed. Barnes and Adams, JJ., concur.*

DECIDED JANUARY 6, 2004 —
RECONSIDERATION DENIED JANUARY 26, 2004

*Andersen, Tate, Mahaffey & McGarity, Thomas T. Tate, Christopher R. Stovall,* for appellant.

*Larry E. Stewart,* for appellee.

*Weissman, Nowack, Curry & Wilco, Frank O. Brown, Jr.,* amicus curiae.