**THIRD DIVISION**
**MILLER, P. J.,**
**RAY and BRANCH, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**March 29, 2013**

# In the Court of Appeals of Georgia

A12A2005, A12A2033. EAGLE JETS, LLC v. ATLANTA JET,
     INC., vice versa.

BRANCH, Judge.

A jury was asked to determine who was responsible for the costs associated
with the loss of a helicopter that, only days after it was purchased, crashed on the
delivery or "ferry" flight between Bolivia and Ft. Lauderdale, Florida, killing two
people, including Sergio Rodrigo, a key person involved in the helicopter purchase.
Eagle Jets, LLC, the ultimate purchaser, brought suit to recover the $1,025,000
purchase price from Appellee Atlanta Jet, Inc. ("AJI"), which located and purchased
the helicopter from the Bolivian seller and, in a "simultaneous transaction," resold the
helicopter to Eagle Jets. The jury found, among other things, that in connection with
the transaction, Rodrigo was an agent of both Eagle Jets and AJI and that Eagle Jets

accepted delivery of the helicopter in Bolivia prior to the ferry flight. Accordingly, the court entered judgment concluding that Eagle Jets was not entitled to recover. Eagle Jets appeals on various grounds, and AJI cross-appeals the trial court's denial of its claim for attorney fees. We affirm the judgment in favor of AJI but reverse the court's decision on attorney fees and remand for a determination of the amount.

Construed in favor of the jury's verdict, the evidence shows that in 2001 , Tim Jones, a successful homebuilder who owned a helicopter that he used in connection with his work, met Rodrigo, a Delta pilot who had learned to fly helicopters and who performed independent contracting work for AJI as both a pilot and a salesman. Jones and Rodrigo became friends, and eventually Rodrigo told Jones about AJI's "investor program" for purchasing business turboprop and jet aircraft. Under the program, the investor would agree to purchase an aircraft and AJI would locate the aircraft, refurbish it, perform the necessary inspections, sell it, and split the profits with the investor. Prior to the eventual sale, the investor had use of the aircraft, although AJI could also use the aircraft for "demo flights" in connection with attempts to resell it. Consequently, AJI maintained insurance on aircraft purchased by investors under the program. Rodrigo's role in the investor program was to identify potential investors and to be a demo pilot for AJI as needed. Jones, through his company Eagle Jets,

LLC, bought two aircraft under the investor program before buying the helicopter at issue in this case. In both cases in the investor program, Rodrigo functioned as AJI's agent and either was, or stood to be, compensated by AJI for his role.

When purchasing aircraft for other parties, either under the investor program or otherwise, AJI typically structured the deal as two separate sales transactions that were closed at the same time; AJI referred to them as "simultaneous" or "pass-through" transactions. One set of documents, including an aircraft purchase agreement ("APA") and a bill of sale, documented AJI's purchase of the aircraft from the seller; another set of documents, including an almost identical APA and a bill of sale, documented AJI's sale of the aircraft to the ultimate purchaser/investor. Jones was aware of and consented to this procedure.

Eventually Jones desired a new helicopter, and he, Rodrigo, and Rick Steelman (the head of AJI) discussed Eagle Jets purchasing a used Eurocopter AS-350B3. But this purchase was not to be performed under the "investor program." Rather, Eagle Jets would be purchasing the helicopter for itself and for Jones's personal use, not for resale. Steelman explained that "[t]he only reason we did the deal was because [Jones] was in our investor program, and it was a favor to a friend type of transaction." Unlike in Eagle Jets's investor program transactions, AJI did not pay or plan to pay Rodrigo

3

a commission on the Eurocopter transaction. Rather, Rodrigio was involved as a favor to Jones, who was going to sell Rodrigo his old helicopter. And AJI agreed to pursue the transaction for a $25,000 flat fee, which was a third of its normal rate. Finally, AJI did not purchase insurance for the Eurocopter.

In the fall of 2003, AJI located a Eurocopter in Bolivia that was owned by a company named HeliBol and negotiated with HeliBol to purchase the helicopter for $1,000,000, which price was communicated to Jones; in turn, AJI agreed to sell it to Eagle Jets for $1,025,000, the difference being AJI's $25,000 fee. Steelman's business practice was to enter into oral agreements and then to ask Barbara Moore, AJI's contract administrator and director of sales support, to arrange for the written agreements, which is how the Eurocopter transaction proceeded. Moore set up the deal as a pass-through transaction in accordance with AJI's practice by preparing paperwork relative to both Eagle Jets and HeliBol.

On September 15, 2003, Moore sent a proposed APA signed by Steelman to Jones at Eagle Jets; Eagle Jets was identified as the purchaser and AJI as the seller. Under the terms of the proposed APA, Eagle Jets bore the risk of loss beginning when Eagle Jets paid the purchase price to AJI:

4

Title to the aircraft free and clear of all liens and encumbrances and risk to the Aircraft shall pass to Purchaser when the purchase price is paid in full to Seller. Seller will maintain full insurance coverage onthe aircraft until the risk or [sic] passes to Purchaser."

The APA also states, "After delivery of the aircraft by Seller to the pre-purchase inspection facility, the aircraft shall not be flown until Purchaser or its designee accepts the aircraft and pays the purchase price in full." Eagle Jets did not respond in writing nor otherwise object to the terms of this first draft of the proposed agreement. On October 20, 2003, a representative of HeliBol signed the parallel APA between HeliBol and AJI.

Meanwhile, all parties proceeded with the pre-purchase inspection of the Eurocopter. Both the Eagle Jets/AJI APA and the AJI/HeliBol APA allowed the parties to address problems discovered during the inspection by agreeing either that the seller would repair any issues prior to closing or that the buyer would perform repairs after closing in exchange for a reduction in the sales price.[1] From October 28

---

[1] Paragraph 9 of the APA provides,
The pre-purchase inspection may reveal warranty deficiencies (hereinafter "deficiencies") and discrepancies (hereinafter "squawks"). . . . If the pre-purchase inspection reveals deficiencies and/or squawks, Purchaser may, at its sole option either: (1) mutually agree with Seller upon a list of deficiencies and squawks to be repaired at Seller's expense at a facility of Atlanta Jet's choosing, subject to the other party's approval, which shall not be unreasonably withheld; or (2) reduce the purchase price by the cost to cure all curable deficiencies and squawks plus the reduction in fair market value of the aircraft by virtue of the incurable deficiencies from its fair market value without such deficiencies.

5

through November 1, 2003, the one and only pre-purchase inspection of the Eurocopter was conducted in Santa Cruz; present were Tim Gorman, the person responsible for the inspection; Fernando Morales, the president of HeliBol; HeliBol's maintenance director; Rodrigo; and Peter Leonard-Morgan, another AJI agent.

During the multi-day inspection, a small number of problems with the Eurocopter were discovered, and AJI and HeliBol agreed on how to handle them; this information was communicated to Jones. For instance, Rodrigo told Jones that the pre-purchase inspection identified three issues that needed to be addressed. AJI and HeliBol decided that one would be remedied on site in Bolivia, one (that did not affect flight safety) would be postponed for repair in Ft. Lauderdale, and one was moot because the parties agreed to change certain equipment attached to the helicopter. Jones never objected to these developments. In fact, Jones admitted he knew that there were problems with the helicopter and that some items would be addressed in Bolivia but that some would be addressed in Ft. Lauderdale, yet he told AJI to proceed with the purchase.

Accordingly, on November 13, 2003, AJI forwarded to Eagle Jets a modified proposed APA together with "Addendum 1 – Acceptance," which stated that the pre-purchase inspection had been performed in Santa Cruz, Bolivia, and it described the

6

results of the inspection and the manner in which the items would be resolved. Addendum 1 also stated that an additional inspection procedure remained open – the "VEMD[2] full power check inspection" – and that "Purchaser (Eagle Jets, LLC.) shall fly a pilot to Bolivia to verify the power check inspection." HeliBol's corresponding Addendum 1 gave the same information except it stated that "Purchaser (Atlanta Jet, Inc.) shall fly a pilot to Bolivia to verify the power check inspection." Jones called Moore on the following day and asked her to revise one item on the first page of the APA, but Jones did not ask for other revisions or complain about other aspects of the APA, including the risk of loss provision. Moore made the revision, and on that same day – November 14 – she sent the revised page to Jones. Moore followed up with Jones's assistant several times thereafter requesting that Jones sign the APA, and Moore was assured that Jones would do so. Nevertheless, Jones never signed the APA nor otherwise accepted the APA in writing.

Subsequently, the VEMD power check revealed a potential problem with the "T4 computer" that could not be fully diagnosed on site in Bolivia. On site in Bolivia, Gorman, Rodrigo, AJI, and HeliBol agreed that the problem did not impair airworthiness, that it would be addressed in Ft. Lauderdale, and that AJI would retain

---

[2] Vehicle Engine Multifunction Display.

7

$25,000 of the purchase price from HeliBol in order to pay for any required repairs; the retention would be adjusted thereafter between HeliBol and AJI depending on the actual cost of the repairs. Rodrigo sent an email to Steelman about the problem on November 21, 2003, but did not copy Jones. Steelman testified that he, Steelman, told Jones about this problem, and Jones admitted that on the same day as the email, Rodrigo told him over the telephone from Bolivia about some type of problem, although he could not remember the nature of the problem discussed. Steelman explained, "we made sure that [Eagle Jets was] going to get reimbursed or that we were going to fix it as outlined in our purchase agreements." AJI added an "Addendum Two" to its contract with HeliBol to address the $25,000 holdback in connection with the T4 computer problem. On November 24, 2003, AJI and HeliBol executed Addendum Two, indicating AJI accepted the helicopter subject to the terms in that addendum. A second addendum for the Eagle Jet APA was never issued.

The simultaneous transactions documenting the sale closed on November 26, 2003, while the Eurocopter was still in Santa Cruz. As a part of the simultaneous closing, funds provided by Eagle Jets were transferred directly to HeliBol via wire transfer from an escrow agent. Two bills of sale were issued that day: one from HeliBol to AJI, signed by Morales; and one from AJI to Eagle Jets, signed by

8

Steelman. In accordance with the risk of loss provision of the APA, Eagle Jets secured insurance for the Eurocopter, effective as of the closing, and that insurance covered the ferry flight.

Jones and Rodrigo planned the ferry flight, with Rodrigo plotting the route, itinerary, and required stops as well as securing supplies for the trip. Eagle Jets paid for the cost of the ferry flight, including the fuel for the flight. On December 9, 2003, during the ferry flight, the helicopter crashed in Brazil, killing Rodrigo and Gonzalvez – the Bolivian pilot – and injuring a passenger. The passenger was a mechanic who had been invited by Gonzalvez to accompany him on the ferry flight. The parties presented conflicting evidence as to the cause of the crash.

On January 20, 2005, Eagle Jets filed suit against AJI raising claims of breach of contract, promissory estoppel, unjust enrichment, and negligence. Eagle Jets later amended its complaint to allege an oral contract instead of a written agreement , and it added claims for fraud, punitive damages, and contribution and indemnification for sums paid in settlement of wrongful death and injury claims filed by the passengers. At trial, the parties agreed to defer the contribution and indemnification claims to a subsequent bench trial. The trial court directed a verdict against Eagle Jets on its claims of promissory estoppel and unjust enrichment, and the jury returned a special

9

verdict, wherein it made the following findings: (1) there was a contract between Eagle Jets and AJI for the purchase of the Eurocopter; (2) the APA was the contract; (3) AJI did not breach the APA; (4) Rodrigo was a dual agent; (5) Neither Eagle Jets nor AJI was in collusion or directly participated with Rodrigo in the commission of any tortious act; (6) Eagle Jets accepted delivery of the Eurocopter in Bolivia prior to the attempted ferry flight; (7) Eagle Jets and AJI did not enter into a bailment agreement; (8) AJI did not commit fraud with respect to the Eurocopter transaction; and (9) AJI did not act in bad faith or with stubborn litigiousness. The court postponed entry of judgment pending its ruling on the parties' attorney fee claims, which it eventually denied. Based on the special verdict, the trial court entered judgment on November 22, 2011, in which it held that Eagle Jets take nothing on its claims against AJI. In case No. A12A2005, Eagle Jets appeals from the judgment; in case No. A12A2033, AJI appeals the denial of its claim for attorney fees.

Case No. A12A2055

1. Although Eagle Jets failed to move for a directed verdict on issues raised in four enumerations of error (Nos. 1, 2, 7, and 8), AJI's contention that Eagle Jets waived any review on appeal is without merit. A party that fails to move for a directed verdict is "barred from contending on appeal that they are entitled to a directed verdict

10

in their favor," but an appellate court may still "review the sufficiency of the evidence under the 'any evidence' standard of review" to determine if that party is entitled to a new trial. (Footnote omitted.) *Aldworth Co., Inc. v. England*, 281 Ga. 197, 201 (2) (2) (637 SE2d 198) (2006). Thus, with regard to Enumerations 1, 2, 7, and 8, we will only review the sufficiency of the evidence in accordance with *Aldworth*. See *Renee Unlimited, Inc. v. City of Atlanta*, 301 Ga. App. 254, 258 (2) (687 SE2d 233) (2009).[3]

Eagle Jets's argument that it, in fact, raised the issues found in Enumerations 1, 2, 7, and 8 in its motion for directed verdict is without merit. At the close of the evidence, Eagle Jets moved for directed verdict on one ground only: that under any construction of the facts, the Uniform Commercial Code (UCC) dictates that the risk of loss of the helicopter had not shifted to Eagle Jets at the time of the accident because AJI failed to deliver conforming goods to Eagle Jets.[4]

---

[3] Enumeration No. 6 will be fully addressed later in this opinion.

[4] Eagle Jets moved as follows:
Your Honor, we respectfully submit this is the same grounds that we had in our summary judgment motion. We respectfully submit that under either version of the contract, there were items that remained to be done, non-conforming items that were not done at the time that the helicopter crashed and that under the Uniform Commercial Code, the risk of loss does not shift to the purchaser until those non conformities that would

11

2. In Enumeration No. 1, Eagle Jets contends there was insufficient evidence to support the jury's finding that the APA, rather than an oral agreement, was the contract between the parties. We disagree. "[A] jury verdict, after approval by the trial court, and the judgment thereon will not be disturbed on appeal if supported by any evidence, in the absence of any material error of law." *Horan v. Pirkle*, 197 Ga. App. 151, 152 (397 SE2d 734) (1990).

Eagle Jets admits there was an agreement between the parties. It attempted to show, however, that because Jones never signed the APA, its rights should be governed by the prior oral agreement between the parties and their past practices under the investor program, which, Eagle Jets asserts, included an understanding that Eagle Jets did not bear the risk of loss until AJI had completed all required inspections and repairs, including those scheduled to be performed in Ft. Lauderdale. Eagle Jets also points to Jones's testimony that, although he intended to proceed with the

permit either rejection of the goods or a revocation of acceptance had been cured and in this case they haven't. So essentially our position is that even if we took everything that Atlanta Jet said as absolutely true and accepted their version of all of the evidence, we would still be entitled to recover the purchase price because the risk of loss had not passed.

12

purchase of a $1 million helicopter, he never intended to sign the written agreement because of inconsistencies between it and the parties' prior oral understanding.

Eagle Jets's enumeration, however, is undermined by its own complaint, in which it asserted that the APA was the agreement between the parties. Although it later amended its complaint to assert an oral agreement, the trial court determined that the original complaint created a rebuttable factual presumption that the APA represented the agreement of the parties. The trial court charged the jury regarding the rebuttable presumption , and Eagle Jets did not object to this charge or raise it as error on appeal. This circumstance distinguishes this case from one where strict application of UCC might lead to a different result.[5] Thus, some evidence was presented to show that the APA was the agreement between the parties, and, accordingly, Eagle Jets is not entitled to a new trial on this question.

---

[5] Under the UCC, where the fact of an agreement is not in doubt, the contract will be found to include all terms upon which the writings of the parties agree plus additional terms allowed pursuant to the UCC. OCGA § 11-2-207 (3). In other words,

> UCC § 2-207 establishes a legal rule that proceeding with a contract after receiving a writing that purports to define the terms of the parties' contract is not sufficient to establish the party's consent to the terms of the writing to the extent that the terms of the writing either add to, or differ from, the terms detailed in the parties's earlier writings or discussions.

(Footnote omitted.) *Step-Saver Data Systems v. Wyse Technology*, 939 F2d 91, 99 (II) (A) (3rd Cir.1991).

13

3. In Enumeration No. 7, Eagle Jets contends there was insufficient evidence to support the jury's finding that Sergio Rodrigo was a dual agent, i.e., an agent of both Eagle Jets and AJI in connection with the Eurocopter transaction. Eagle Jets also argues that the jury's finding was "indefinite as to the scope of any dual agency."

"The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." OCGA § 10-6-1. An agent is authorized to act for another "when, expressly or impliedly, there has been a delegation with more or less discretionary power to act, to manage an affair, and to render an account." (Citations omitted.) *Headrick v. Fordham*, 154 Ga. App. 415, 417 (1) (268 SE2d 753) (1980). Although ordinarily a person is not a dual agent, case law provides "that one may be the servant of two masters and subject to the demands of both or either." (Citations omitted.) *Merry Bros. Brick and Tile Co. v. Jackson*, 120 Ga. App. 716, 719 (171 SE2d 924) (1969). A dual agency arises "when the agent of one principal is also acting in a particular transaction as the agent of another principal." (Citation and emphasis omitted.) *Johnson Realty v. Hand*, 189 Ga. App. 706, 714 (16) (377 SE2d 176) (1988). Under those circumstances, "each of the principals is under an equal duty

14

to exercise ordinary care in selecting and supervising the agent to protect his own interests." *Hodges v. Mayes*, 240 Ga. 643, 644 (1) (242 SE2d 160) (1978).

Whether a dual agency exists is most often a question of fact. See, e.g., *Shaw v. Fillman*, 184 Ga. App. 364, 365 (1) (361 SE2d 518) (1987); *Reliance Ins. Co. v. Bridges*, 168 Ga. App. 874, 879 (1) (d) (311 SE2d 193) (1983). Compare *Jim Royer Realty, Inc. v. Moreira*, 184 Ga. App. 848, 850 (363 SE2d 10) (1987) (physical precedent only) (summary judgment proper where plaintiff failed to rebut sworn affidavit by alleged dual agent to the effect that she never agreed to represent or advise the plaintiff). But see *Home Materials v. Auto Owners Ins. Co.*, 250 Ga. 599, 602 (2) (300 SE2d 139) (1983) (citing *Wright Body Works v. Columbus Interstate Ins. Agency*, 233 Ga. 268 (210 SE2d 801) (1974)) ("Dual agency is proper where the agency is known to the principals and the principals do not repudiate it.").

At trial, Jones testified he relied on Rodrigo in the transaction, told Rodrigo to keep him informed, and talked to Rodrigo every day. Rodrigo and Jones exchanged numerous emails and telephone calls during the transaction, including while Rodrigo was in Bolivia for both the pre-purchase inspection and the subsequent trip that included the ferry flight. Jones's son testified that "we were sending Sergio [Rodrigo]" to the pre-purchase inspection. Three days after the closing, Rodrigo

15

drafted a letter on behalf of Jones that had been requested by AJI for forwarding to the FAA. Rodrigo signed at least one government form as "agent/pilot Atlanta Jet/Eagle Jets." And Rodrigo assisted Jones in securing insurance for the helicopter.

More importantly, Jones's testimony showed he exercised control over Rodrigo. After paperwork difficulties initially delayed the flight home from Bolivia, Jones told Rodrigo, "Sergio, get on a plane and come home. Don't worry about that helicopter. We'll get it another day. Come home." Rodrigo responded that he would, and Jones replied, "[F]ine. Come home. Let's deal with the helicopter. We'll get somebody else to bring it back. Don't worry about the helicopter." Jones gave other testimony demonstrating his control over Rodrigo. Rodrigo was not certified to fly the Eurocopter himself, and Jones told Rodrigo that he therefore did not want Rodrigo to pilot the ferry flight. Jones testified that Rodrigo arranged for the actual pilot, Manuel Gonzalvez. And AJI denied that it agreed to pay Gonzalvez. When Rodrigo devised the itinerary of the ferry flight, Jones even talked to Rodrigo about possibly stopping at Jones's vacation home in Turks and Caicos as a part of the ferry flight to Ft. Lauderdale.

Steelman testified that although Rodrigo acted on behalf of AJI in the Eurocopter transaction, unlike the earlier transactions between AJI and Eagle Jets,

16

Rodrigo did not stand to get a commission on the helicopter purchase; rather, he was involved as a favor to Jones, who was going to sell Rodrigo his old helicopter.

In short, some evidence was presented in support of the jury's finding that Rodrigo was functioning as a dual agent. See, e.g., *Shaw v. Fillman*, 184 Ga. App. at 365 (issue of fact regarding dual agency).

Eagle Jets also argues that even if Rodrigo was a dual agent, no evidence was presented to show that the scope of his agency to act on behalf of Eagle Jets included control over the ferry flight from Bolivia to the United States, such that any alleged negligence related to the crash could be imputed to Eagle Jets. First, the jury was not asked to determine the scope of Rodrigo's agency to Eagle Jets, and therefore, there is no jury finding to review. Second, evidence that both AJI and Eagle Jets had previously employed Rodrigo as a pilot, that Jones considered having Rodrigo bring the helicopter to Jones's vacation home as a part of the ferry flight, that Jones said he could get another pilot to "bring [the Eurocopter] back," and other evidence set forth above constituted some evidence that the scope of Rodrigo's agency on behalf of Eagle Jets included aspects of inspection, acceptance, and delivery of the aircraft, including the ferry flight. See *Gulf Winds, Ltd. v. First Union Bank*, 187 Ga. App. 383, 385-386 (1) (370 SE2d 508) (1988) (extent of agent's authority is a question of

17

fact). Because some evidence was presented to show the scope of Rodrigo's agency on behalf of Eagle Jets, there is no basis to disturb the trial court's judgment. See *Horan v. Pirkle*, 197 Ga. App. at 152.

4. In Enumerations No. 2 and 3, Eagle Jets contends the evidence established that AJI failed to deliver conforming goods in accordance with the APA and the UCC and that it therefore breached the agreement between the parties and acted contrary to the terms of the UCC. See OCGA § 11-2-510 (1). Eagle Jets argues that it therefore had a right to reject the helicopter and that, consequently, AJI bore the risk of loss at the time of the crash. This argument fails both under the APA and the UCC.

(a) As shown above, the APA provides that "risk to the Aircraft shall pass to purchaser when the purchase price is paid in full to Seller." The APA also states, "After delivery of the aircraft by Seller to the pre-purchase inspection facility, the aircraft shall not be flown until Purchaser or its designee accepts the aircraft and pays the purchase price in full." It is undisputed that after the inspection procedure, Eagle Jets caused the purchase money to be wired to Helibol at the closing, which occurred prior to the ferry flight. And the jury found that Rodrigo, who had complete knowledge of the events in Bolivia, was an agent of Eagle Jets and that Eagle Jets accepted delivery in Bolivia before the ferry flight. By accepting delivery, Eagle Jets

18

assumed the risk of loss pursuant to the APA. Although the APA also provided that Eagle Jets and AJI could work out any remaining discrepancies discovered during the inspection by agreeing that AJI would make repairs at its expense at a facility of its choosing, see footnote 1, supra, the APA does not provide that these discrepancies would cause the risk of loss to remain with AJI such that loss of the helicopter during that time would constitute a breach of the APA.

Moreover, the simultaneous nature of the two closings distinguishes this case from one where two sales are separated in time, with each purchaser performing independent inspections and demanding independent assurances from each seller in turn.[6] Here, the parties knowingly treated the two transactions as one. There was never an understanding that the separate agreements could function separately in time, and both parties contemplated simultaneous closings, which is what occurred.

In sum, there was some evidence upon which the jury could rely in concluding that AJI did not breach the agreement between the parties. And the trial court was authorized to conclude, based on the jury's special findings, that under the APA the

---

[6] For example, both the Eagle Jets/AJI APA and the AJI/HeliBol APA identified Tim Gorman as the person who would perform the pre-purchase inspection, yet AJI hired Gorman, and Gorman performed the only inspection.

19

risk of loss remained with Eagle Jets despite any agreement that AJI would effect additional repairs in Ft. Lauderdale.

(b) Eagle Jets's argument that a different result is required by OCGA § 11-2-510 is unavailing. That provision of the UCC states, "Where a tender or delivery of goods so fails to conform to the contract as to give a right of rejection the risk of their loss remains on the seller until cure or acceptance."

But analysis of Section 11-2-510 must begin with OCGA § 11-2-509, which provides that the parties may make their own agreement regarding risk of loss in the absence of breach:

> The provisions of this Code section are subject to contrary agreement of the parties and to the provisions of this article on sale on approval (Code Section 11-2-327) and on effect of breach on risk of loss (Code Section 11-2-510).

OCGA § 11-2-509 (4). As shown above, the parties agreed that the risk of loss passed when Eagle Jets paid for the helicopter, which occurred before the ferry flight. Eagle Jets counters that OCGA § 11-2-509 is only applicable absent a breach of contract and that, because AJI never tendered or delivered a helicopter in conformance with the contract, it thereby breached the contract; thus, under OCGA § 11-2-510, the risk of loss remained on AJI. But as shown in Division 4 (a), the jury was authorized to

20

conclude that AJI did not breach the APA. OCGA § 11-2-509 (4) is therefore applicable.

Moreover even if AJI could be viewed as having breached the agreement by failing to deliver conforming goods, OCGA § 11-2-510 places the risk of loss on the seller only "until cure or acceptance." The UCC provides that acceptance occurs when the buyer "[a]fter a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity." OCGA § 11-2-606 (1) (a). The communication of acceptance may occur "by words, action, or silence when it is time to speak." OCGA § 11-2-606, cmt. 1. Here, after the pre-purchase inspection, Rodrigo, acting as an agent of Eagle Jets, took physical possession of the aircraft and initiated the ferry flight with complete knowledge of the condition of the helicopter. Thus, OCGA § 11-2-510 (1) does not dictate that the risk of loss remained with AJI during the ferry flight.

In short, some evidence was presented supporting the jury's finding that Eagle Jets accepted and took physical possession of the helicopter in Bolivia before the ferry flight and that it did so with knowledge of the helicopter's condition. Eagle Jets therefore bore the risk of loss despite its agreement with AJI that AJI would effect additional repairs in Ft. Lauderdale. And the trial court did not commit an error of law

21

by denying Eagle Jet's motion for a directed verdict on its argument that the issue of risk of loss was governed in its favor by the UCC. Accordingly, Enumerations No. 2 and 3 are without merit.

5. In Enumeration No. 8, Eagle Jets claimed that AJI was responsible for the loss of the Eurocopter because AJI's agents Rodrigo and Gonzalvez were negligent on the ferry flight and their negligence caused the crash. Eagle Jets argues that the jury's denial of Eagle Jets's negligence claim "based on the jury's determination that Sergio Rodrigo was a 'dual agent'" was not supported by the evidence. But, as shown above, the jury was authorized to conclude that Rodrigo was a dual agent for the purpose of inspection, acceptance and delivery of the helicopter. And neither principal of a dual agent may sue the other for negligent performance in the dual agent's agency unless the defendant principal was in complicity in the agent's negligence:

> It is generally recognized that where an agent represents two adverse parties in a transaction with the knowledge and consent of both, neither principal is liable to the other for the tortious acts of the agent so situated where the opposite principal is not in complicity with the agent or in no way participates in the tortious act. . . . [E]ach of the principals is under an equal duty to exercise ordinary care in selecting and supervising the agent to protect his own interests.

22

*Hodges v. Mayes*, 240 Ga. at 644 (1). See also *Edwards-Warren Tire Co. v. Cole, Sanford & Whitmire*, 188 Ga. App. 395, 397 (1) (373 SE2d 83) (1988). The jury was asked whether AJI colluded or directly participated with Rodrigo with regard to any tortious act that might have caused the loss of the Eurocopter, and Eagle Jets did not object to the form of that special jury question. The jury concluded that AJI was not in complicity, and, as already shown, some evidence was provided to support the finding that Rodrigo was acting on behalf of Eagle Jets with regard to planning and executing the ferry flight. Therefore Enumeration No. 8 must fail.

6. In Enumeration No. 4, Eagle Jets contends the trial court erred by failing to charge the jury that "title is not relevant to risk of loss under the contract," which was one sentence of its proposed jury instruction No. 27. "When we review an allegedly erroneous jury charge, we apply a 'plain legal error' standard of review." *Goody Products, Inc. v. Development Auth. of City of Manchester*, (Case No. A12A1724, decided March 20, 2013) (footnotes omitted). And "jury instructions must be read and considered as a whole in determining whether the charge contained error." (Citations and punctuation omitted.) *Sullivan v. Sullivan*, 273 Ga. 130, 132 (2) (539 SE2d 120) (2000).

23

The record shows the trial court instructed the jury that "the fact that one party or the other holds title to the goods at the time of their loss is not conclusive as to the determination of which party bore the risk of loss." Furthermore, the trial court instructed the jury on the applicable sections of the UCC pertaining to risk of loss, including that "If the parties have agreed otherwise, their agreement regarding risk of loss is binding on them." Viewing the charge as a whole, we find no plain legal error.

7. In Enumeration No. 5, Eagle Jets contends the trial court erred by failing to instruct the jury that FAA registration (which was in the name of Eagle Jets) is not to be considered evidence of ownership and in allowing the Eurocopter FAA registration to be introduced for that purpose. We disagree.

(a) First, Eagle Jets introduced the Eurocopter's FAA registration into evidence, and therefore it may not complain on appeal about that evidence. See *Wallace v. Swift Spinning Mills*, 236 Ga. App. 613, 617 (2) (511 SE2d 904) (1999) (party may not complain about error induced the party's own tactics or conduct).

(b) Second, Eagle Jets asked for a jury instruction to the effect that under federal law, registration of an aircraft with the FAA is not evidence of ownership and that the FAA does not endorse any ownership information on a certificate of aircraft registration. See generally 49 USC § 44103 (c) (2) (a certificate of registration is "not

24

evidence of ownership of an aircraft in a proceeding in which ownership is or may be in issue"); 14 CFR § 47.5 (c) ("The FAA does not issue any certificate of ownership or endorse any information with respect to ownership on a Certificate of Aircraft Registration."). Eagle Jets contends that without the instruction, the jury was likely confused about the difference between ownership, risk of loss, and "responsibility for the flight and agency."

But Eagle Jets was allowed to present expert testimony regarding the difference between being a registered owner of an aircraft and the operator of that aircraft under FAA law. And Eagle Jets did not object when, during cross-examination by Eagle Jets, Barbara Moore testified that filing an FAA registration transfers title to the aircraft. Finally, the trial court instructed the jury about the rules regarding transfer of the risk of loss under the UCC, the effect of contrary terms of a contract or course of dealing between the parties, the definition of risk of loss, the relationship between the risk of loss and the requirement that a seller furnish conforming goods, and other rules regarding transfer of the risk of loss. And, as shown above, the trial court instructed the jury that the issue of who has title to the goods and the issue of which party bore the risk of loss are separate and distinct.

25

Again, we find no plain legal error. *Goody Products*, supra. "If the charge as a whole substantially covered the issues to be decided by the jury, we will not disturb a verdict supported by the evidence simply because the charge could have been clearer or more precise." (Citation omitted.) *Lee v. Swain*, 291 Ga. 799, 800 (2) (a) (733 SE2d 726) (2012).

8. Finally, in Enumeration No. 6, Eagle Jets contends the trial court erred by excluding expert witness evidence that AJI was the "operator" of the flight under FAA rules and regulations. We review the trial court's decision regarding the introduction of evidence for abuse of discretion. *Bowen & Bowen Const. Co. v. Fowler*, 265 Ga. pp. 274, 278 (4) (593 SE2d 668) (2004).

Eagle Jets argues that the evidence was relevant because under federal law, which, it argues, preempts state law with regard to its negligence claim, the "operator" of the aircraft – the party in "actual possession or control" of the aircraft (which may be different from the party holding title or bearing the contractual risk of loss) – is the only party who can be liable for damages arising out of the loss of an aircraft.[7] We

_____

[7] Citing 49 USC § 44112 (b) ("A lessor, owner, or secured party is liable for personal injury, death, or property loss or damage on land or water only when a civil aircraft, aircraft engine, or propeller is in the actual possession or control of the lessor, owner, or secured party."), Eagle Jets also contends it should have been allowed to show that under federal law only AJI could be deemed responsible for the loss of the

26

find no error because the court, in fact, allowed Eagle Jets to outline and explain FAA regulations to this jury. The court only prohibited expert testimony on whom the FAA would consider the operator of the aircraft to be when it crashed. The trial court stated that the expert could present "what the significance of 'operator' is as opposed to what the registered owner is. But what he can't do… is tell the jury that he thinks Atlanta Jet was the operator of this… I think it invades [the jury's] province." We find no abuse of discretion.

Moreover, we find no reference by Eagle Jets to the theory of preemption or the applicability of federal law either in the pretrial order signed by the parties , in the proposed jury instructions , or in the colloquy regarding Eagle Jets's proffer . The issue, therefore, was not properly reserved for trial and, as the trial court found, it was not relevant to the issues being tried.

> A pretrial order limits the issues for trial to those not disposed of by admissions or agreements of counsel. The order, when entered, controls the subsequent course of the action unless modified at the trial to prevent manifest injustice. OCGA § 9-11-16 (b). If a claim or issue is omitted from the order, it is waived.

aircraft even if Rodrigo was considered a dual agent under state law.

(Citations and punctuation omitted.) *Long v. Marion*, 257 Ga. 431, 433 (2) (360 SE2d 255) (1987).[8]

Here, the parties went to trial on Eagle Jets's state law claims against AJI for breach of contract and negligence, both of which involved the question of who was responsible for the ferry flight from Bolivia to Ft. Lauderdale, as well as the question of Rodrigo's agency under state law. Eagle Jets never raised the legal issue that federal law would preempt state law regarding its negligence claim. Indeed, Eagle Jets reiterated during the colloquy that the ultimate issue in the case was "the issue of agency under Georgia law." Accordingly, any possible error on this topic was waived. See *Long*, 257 Ga. at 433 (2).

Case No. A12A2033

On cross-appeal, AJI contends the trial court erred by denying its motion for attorney fees and costs. A decision by the trial court on the construction of a contract is subject to de novo review. *Donchi, Inc. v. Robdol, LLC*, 283 Ga. App. 161, 163-164 (1) (a) (640 SE2d 719) (2007).

---

[8] The exception, which does not apply here, is that "[o]mission of an issue from a pretrial order is not controlling if evidence pertaining to the issue is introduced without objection, the opposing party is not unfairly surprised, and the issue is actually litigated." (Citation omitted.) *Dunkin' Donuts of America v. Gebar, Inc.*, 202 Ga. App. 450, 451 (1) (b) (414 SE2d 683) (1992).

28

AJI moved for attorney fees as the prevailing party under the terms of the APA. Paragraph 16 of the APA states:

> Litigation Expenses: If litigation is instituted to enforce this Agreement, the prevailing party shall be awarded its attorney's fees incurred and all litigation costs, including depositions, expert witness fees, photographic expense, witness travel and lodging expense and all court costs.

The trial court noted that while Eagle Jets relied on the APA in its initial complaint, Eagle Jets later amended its complaint to remove reference to the APA and assert theories of liability under agreements other than the APA. The court quoted OCGA § 9-11-15 (a), which states that "[a] party may amend his pleading as a matter of course and without leave of court at any time before the entry of a pretrial order." It then reasoned that although admissions in pleadings are binding, see OCGA § 24-3-30, a party may amend its pleadings to withdraw admissions and then introduce evidence contravening the admissions. See *SAKS Assocs., LLC v. Southeast Culvert, Inc.*, 282 Ga. App. 359, 364 (2) (638 SE2d 799) (2006). Accordingly, the trial court concluded that Eagle Jets "did not institute litigation to enforce the APA," and it therefore denied AJI's motion.

"[I]n the absence of a controlling statute, a party's entitlement to attorney fees under a contractual provision is determined by the usual rules of contract

interpretation." (Citation and punctuation omitted.) *Benchmark Builders v. Schultz*, 289 Ga. 329, 330-331 (2) (711 SE2d 639) (2011). "The construction of a contract is a question of law for the court." OCGA § 13-2-1. "Where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties." (Citation and punctuation omitted.) *Kammerer Real Estate Holdings, LLC v. PLH Sandy Springs, LLC*, __ Ga. App.__ (1) (734 SE2d 249) (2012).

The APA requires as a condition precedent to recovery of attorney fees and costs by the prevailing party, that "litigation [be] instituted to enforce this Agreement." Eagle Jets filed suit in January 2005. In its initial complaint, Eagle Jets alleged that the parties entered into a contract, that AJI breached the contract, and that "[a] true and correct copy of the Purchase Agreement is attached hereto as Exhibit 'A'." Attached as Exhibit A to the complaint is the November 13, 2003 APA signed by Steelman, and it includes the "terms and conditions" including the "Litigation Expenses" provision. In February 2005, AJI answered and asserted certain provisions of the APA as a defense to the claims. It is clear, therefore, that as of February 2005, Eagle Jets had instituted litigation to enforce the APA and AJI was defending based on the APA, as well. The litigation was never dismissed and instituted a second time. Rather, one year after filing the initial complaint, Eagle Jets amended its complaint to

remove references to the APA and instead assert claims based on a "purchase agreement" between the parties, without specifying the form of that agreement. The amendment raised an issue of fact regarding whether the APA constituted the agreement between the parties. The trial court instructed the jury that the initial complaint created a rebuttable presumption that the APA was the agreement:

> Because Eagle Jets has stated in a court document that the aircraft purchase agreement was the applicable contract between [the parties], you may consider that as rebuttable evidence that the [APA] is the contract between the parties.

And the jury concluded that the APA was the agreement between the parties.

Unlike the trial court, we fail to see how Eagle Jets's amendments to the complaint change the fact that the litigation was "instituted to enforce the [APA]." Black's defines the verb "institute" as "To begin or start; commence." Black's Law Dictionary (9th ed. 2009). Although the complaint was later amended, that amendment occurred in the same litigation. We conclude that the litigation before us was instituted to enforce the APA and that the trial court erred by concluding otherwise.

We also conclude that AJI was the prevailing party in the litigation. The Supreme Court of Georgia has held that a party prevails "when actual relief on the merits materially alters the legal relationship between the parties by modifying the

[second party's] behavior in any way that directly benefits the [first party]." *Magnetic Resonance Plus v. Imaging Systems Intl.*, 273 Ga. 525, 528 (543 SE2d 32) (2001). See also Black's Law Dictionary (9th ed. 2009) ("prevailing party" is "[a] party in whose favor a judgment is rendered, regardless of the amount of damages awarded.") Cf. *Johnson Real Estate Investments v. Aqua Industrials*, 282 Ga. App. 638, 643 (4) (639 SE2d 589) (2006) (fee-shifting language of agreement did "not limit recovery only to the person who brings the action, but rather allows recovery to the prevailing party. Thus, the language contemplates that the party defending the action could prevail and would be entitled to recover attorney fees."). Compare *Morris v. Morris*, 222 Ga. App. 617, 618 (1) (475 SE2d 676) (1996) (voluntary dismissal of action was not an adjudication of the merits, so defendant was not a prevailing party entitled to attorney fees).

Here, following an adjudication on the merits, the jury held, among other things, that the APA was the agreement between the parties, that AJI did not collude with Rodrigo in any tort, that AJI did not enter into a bailment agreement with Eagle Jets, and that AJI did not commit fraud; as a consequence, the trial court entered a judgment denying all of Eagle Jets's claims. It follows that AJI was the prevailing party in the litigation. And the fee-shifting clause of the APA provides that the

32

prevailing party "shall be awarded its attorney's fees. . . ." We therefore reverse the trial court's denial of AJI's motion for fees and remand the case for further proceedings to determine the proper amount of fees to be awarded.

*Judgment affirmed in Case No. A12A2005; Judgment reversed in Case No. A12A2033, and case remanded with direction. Miller, P. J., and Ray, J., concur.*