**FOURTH DIVISION
DILLARD, P. J.,
BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**October 9, 2024**

# In the Court of Appeals of Georgia

A24A1103. DIXIE AMUSEMENT, LLC v. PRIMERO GAMES, LLC.

BROWN, Judge.

This is the second appearance before this Court of a business dispute involving Dixie Amusement, LLC, a coin-operated amusement machine (COAM) master licensee, and Primero Games, LLC, a COAM manufacturer, that resulted in a jury awarding both parties compensatory damages. See *Primero Games, LLC v. Dixie Amusement, LLC*, 369 Ga. App. XXVI (October 31, 2023) (unpublished) ("*Primero I*"). In *Primero I*, we found the evidence insufficient to support the jury's verdict on Dixie's breach of contract and breach of warranty claims, vacated the award of compensatory damages to Dixie, and remanded the case for a new trial. Slip Op. at 11-16 (2) (a), (b). We also vacated the trial court's order on Primero's claim for

declaratory relief and remanded the case for the trial court to provide a definitive ruling as to the applicability of OCGA § 11-2-207 to the contracts between the parties. Id. at 20-21 (6). Following remand, the trial court effectively ruled in favor of Primero on its claim for declaratory relief. Dixie appeals this ruling. For the reasons discussed below, we vacate the trial court's order and remand this case with direction.[1]

The relevant underlying facts and issues were set out in our prior opinion:

[T]he evidence at trial showed that Primero and Dixie are both involved in the COAM[2] industry. The parties stipulated to certain facts, including that Class B COAMs in Georgia are redemption devices that are also games of skill that may allow successful players to carry over points won on one play to a subsequent play or plays. Class B COAMs generally are comprised of a cabinet, monitor screen, computer board with software chip, bill accepter, printer, and other component parts. Effective as of

---

[1] We have circulated this decision among all nondisqualified judges of the Court to consider whether this case should be passed upon by all members of the Court. Fewer than the required number of judges, however, voted in favor of a hearing en banc on the question of overruling *Ready Trucking v. BP Exploration & Oil Co.,* 248 Ga. App. 701, 704 (2) (548 SE2d 420) (2001).

[2] Generally, COAMs are machines "of any kind or character used by the public to provide amusement or entertainment whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket, card, or similar object and the result of whose operation depends in whole or in part upon the skill of the player[.]" OCGA § 50-27-70 (b) (2) (A).

April 10th, 2013, the Georgia Lottery Corporation, or the GLC, regulates the COAMs industry. The GLC currently has rules and regulations in place for COAMs. Upon assuming the regulatory duties of compliance and enforcement of Class A and Class B COAMs in Georgia, the GLC issued new regulations which required all Class B COAMs to be configured or reconfigured to communicate with the GLC Central accounting system known as the INTRALOT system, which requires COAM software to include Slots Accounting System, SAS, communication capabilities. The GLC warned that any COAM operating in the field not using an SAS-compliant protocol by December 31st, 2016, would be disabled and would have to be immediately removed from the business location by the Class B master license holder, such as Dixie. Founded in 2009, Primero is an authorized manufacturer of Class B COAMs in the [S]tate of Georgia.[3] Primero sells Class B COAMs. And [ ] Dixie is a master licensee that owns Class B COAMs throughout Georgia.[4]

Dixie purchased its first COAM from Primero in 2013. Dixie continued purchasing COAMs and chipsets from Primero through 2017.[5] The majority of the early purchases were for full COAMs, and later

---

[3] See OCGA § 50-27-70 (b) (9) (defining "manufacturer").

[4] See OCGA § 50-27-70 (b) (10) (defining "master license"); (b) (10.1) (defining "master licensee").

[5] A full COAM includes a chipset, which contains software that allows the COAM to run a particular game.

purchases also included chipsets, some of which were purchased to comply with the GLC's new regulations requiring all Class B COAMs to be configured or reconfigured to communicate with the GLC's INTRALOT system.[6]

According to Dixie's owner, most of its purchases from Primero began with a phone call from Dixie to Primero to place an order for specific equipment. Primero then informed Dixie when to pick up the equipment, and at the time of pick up, Dixie paid for the equipment and received an invoice for the sale. In 2013 and at least part of 2014, the invoices from Primero to Dixie contained no reference to any terms of sale or additional charges. Invoices Dixie received from Primero in 2015 and early 2016 contained additional language at the bottom of the invoice: "This sale is subject to, and governed by, the Primero Games Terms of Sale available at www.primerogames.com/termsofsale/ which are incorporated herein by reference. Primero will not charge activation fees or renewal fees for the software version described in 'Georgia COAM SAS Requirements[,]' document version 1.6, under GLC's RU 13.1.14."

In late January 2016, Primero removed the "will not charge" language, and Dixie received invoices in 2016 and 2017 that provided: "This sale is subject to, and governed by, the Primero Games Terms of Sale

---

[6] To comply with these regulations, Primero invested approximately $2 million to purchase new technology and later designed its own SAS-compliant software, which it sold to Dixie to upgrade its machines.

4

available at [www.primerogames.com/termsofsale/](www.primerogames.com/termsofsale/) which are incorporated herein by reference."

Primero adopted its first Terms of Sale in March 2014, and those terms were updated in September 2015, January 2016, October 2016, and January 2019. Since their adoption, the Terms of Sale have been available on Primero's website. Terms common to all versions include: The software is licensed, not sold, and all ownership rights to the software shall remain with Primero and its licensors;[7] Each software license "will be interpreted as a single agreement, independent of any other orders;" Primero reserves the right to charge "for any updates, fixes, upgrades, new versions, or other changes to the Software or Hardware," and "for activations (including new activations and re-activations);"[8] The term of each software license continues until the software's fill code or timer expires; "[E]ach fill code, timer reset code and activation code provided by Primero shall be considered a new Software license, regardless if such code is made available to you without charge;" Primero may terminate or "suspend a Software license (including but not limited to, suspend the provision of fill codes, timer reset codes or activation codes)" if a

_____

[7] Software is defined as "any software, library, utility, tool, or other computer or program code, in object or source-code form . . . provided by Primero to you. Software includes, but is not limited to, software located in or on the Hardware[.]" The definition of "Hardware" included computer chips and motherboards, among other tangible materials.

[8] The phrase "for activations (including new activations and re-activations)" was added in the January 2016 version, and the October 2016 version added "fill codes" and "timer reset codes" to this list.

customer fails to make "any payment when due;" and "If Primero has the right to suspend or terminate any Service or Software license hereunder, Primero, in its sole discretion, may suspend or terminate any or all other Services or Software licenses that are subject to this Agreement" (the "cross-default provision").

Prior to the SAS upgrades required by the GLC, only two styles of boards included activation timers, but after the upgrade, Primero included them on all of its boards. If the software included a timer, when the timer ran out (usually after one year), the machine shut down and the customer would be required to obtain a fill code, activation code, or timer reset code.[9] These codes could be obtained by calling Primero's customer service group or using a website provided by Primero. Prior to June 15, 2017, Primero did not charge fees for providing these codes.

In May 19, 2017, Dixie received an email from Primero notifying it that, starting on June 15, 2017, "Primero will charge an annual service fee for all software renewals. The fees are $25 for online renewals and $45 for tech-assisted phone renewals." The email also stated that as of May 10, 2017, all software transfers between customers will incur a $495 transfer fee. Dixie responded by email on June 16, 2017, stating that it did "not agree to pay the fees for refill codes" because Primero had never informed Dixie that there would be an annual service fee and, when

---

[9] Primero used these terms interchangeably, and the Terms of Sale defined them as "a computer code sold or provided by Primero that enables Software to operate or continue operating."

asked, had previously informed Dixie that no transfer or service fees would be charged. A former Primero salesperson confirmed that originally, when customers asked if they would be charged for activation fees when a machine's timer ran out, Primero employees told them that there would [be] no activation fee, and that Primero displayed a banner in its facility that stated Primero would not charge activation fees, but that later a decision was made to begin charging customers these fees. After June 15, 2017, Dixie began receiving invoices from Primero for "annual service charges." Although Dixie did not pay the invoices, Primero continued to provide fill codes in 2017 and part of 2018.

In February 2018, Primero placed Dixie's account on hold, which prevented Dixie from obtaining fill codes for its Primero machines with expired timers. After several emails from Dixie's owner to the Primero accounting department, Dixie was referred to Primero's in-house counsel, who ultimately restored Dixie's access to the activation site so that it could obtain fill codes while the parties attempted to resolve the fee dispute. The dispute was not resolved, and in April 2018, Dixie's owner received a letter from Primero's in-house counsel informing him of Dixie's past due balance, including service fees, and requesting that the overdue amount be paid immediately. Counsel further stated that if Dixie refused to pay all amounts owed before July 17, 2018, Dixie would lose the ability to use its machines after the timers expired and that Primero would inform the GLC if Dixie's machines became inactive.

In August 2018, Dixie filed suit against Primero, asserting claims for breach of contract, breach of warranty, fraud in the inducement, and conversion and seeking compensatory damages, punitive damages, and attorney fees and expenses under OCGA § 13-6-11. Primero answered and asserted a counterclaim that included a request for declaratory judgment[10] and claims for breach of contract and attorney fees and expenses under OCGA § 13-6-11.[11] Both parties filed motions for partial summary judgment, which the trial court denied.

After a four-day jury trial, the jury awarded damages to both parties. On Dixie's claims, the jury found that Primero breached a contract between the parties and breached an express warranty that it gave to Dixie, but that Primero did not make any false representations to Dixie regarding the COAMs and did not improperly convert property that Dixie owned. The jury awarded Dixie $80,000 in compensatory damages and concluded that Dixie was entitled to recover attorney fees and costs from Primero based on bad faith, stubborn litigiousness, or

[10] Primero asserted that it is entitled to declaratory judgment as follows: (1) "All 290 sets of Primero software are subject to the Primero Games Terms of Sale"; (2) "All 290 sets of Primero software have a one year license period pursuant to the Primero Terms of Sale"; and (3) "Primero is under no obligation to renew such 290 Primero software licenses when they expire at the end of their respective license periods."

[11] Primero did, however, agree to give Dixie access to the fill codes during this litigation.

causing Dixie unnecessary trouble and expense.[12] On Primero's counterclaim, the jury found that Dixie had breached a contract between the parties and awarded Primero $20,000 in compensatory damages but concluded that Primero was not entitled to attorney fees. The trial court then made the jury's verdict the order and judgment of the court.

In addition, the trial court issued an order on Primero's request for a declaratory judgment in which it: (1) declined to declare as a matter of law that Primero's Terms of Sale apply to all 290 software licenses issued by Primero to Dixie; (2) declared that "[t]he timers contained within the software of [COAMs] purchased by [Dixie] from [Primero] are subject to limited license periods *only* as required by the Terms of Sale in place at the time said invoice for each particular COAM was issued; and *only if* said invoices specifically incorporate the Terms of Sale on the face of the invoice/bill of sale. Otherwise, no such limited license period exists;" and (3) declined to "declare as a matter of law that Primero is under no obligation to renew Dixie's software license or provide reset codes when they expire at the end of their respective license periods." Instead, the parties are "bound by the language, if any, pertaining to licensing renewals or provision of reset codes in whatever version of the Terms of Sale [was] in place at the time of issuance of each COAM (and specifically referenced in the invoice/bill of sale)."

(Emphasis in original.) *Primero I*, Slip Op. at 2-10.

---

[12] The trial court subsequently awarded Dixie attorney fees in the amount of $133,352.90.

The parties appealed; Primero appealed the denial of its motion for a directed verdict and also challenged a number of the trial court's rulings during trial and its failure to grant Primero's full declaratory judgment request, and Dixie filed a cross-appeal of the trial court's order on Primero's claim for declaratory relief, contending that the trial court should have applied OCGA § 11-2-207 ("Section 2-207") to the contracts between the parties and excluded the Terms of Sale because they materially alter the contracts.[13] *Primero I*, Slip Op. at 1-2, 20 (6). Concluding that the trial court had failed to address the applicability of Section 2-207, we vacated its order and remanded the case back to the trial court to make clear its reasoning and provide a definitive ruling on this issue as well as the applicability and effect of the cross-default provision in the Terms of Sale. Id. at 20-21 (6). Following remand, the trial court issued a final judgment on Primero's claim for declaratory relief, finding Section 2-207 inapplicable and concluding that "each transaction[, i.e., all 290 software licenses,]

---

[13] As explained in *Primero I*, while the parties agreed that the Uniform Commercial Code applied to the case, they disagreed about the applicable statute. Slip Op. at 12-13 (2) (a). Primero argued that OCGA § 11-2-201 applied and that the Terms of Sale are incorporated into all relevant invoices, and that when Dixie failed to object to the invoices within 10 days, it became bound by the Terms of Sale. Id. at 12-13 (2) (a). Dixie, on the other hand, argued that OCGA § 11-2-207 applied, and that the Terms of Sale were not incorporated into any of the contracts between the parties because they materially alter the parties' contracts. Id. at 13-14 (2) (a).

between the parties during the relevant time period are bound by [Primero's] Terms of Sale . . . which were made part of the contract of the parties pursuant to, and in alignment with, the requirements of OCGA § 11-2-201." In reaching this conclusion, the trial court noted that the jury's award of damages to Primero on its breach of contract claim against Dixie (which was not challenged in *Primero I*), demonstrated that the jury had found that the Terms of Sale were at least applicable to some of the sales transactions between the parties, and that the Terms of Sale authorized Primero to charge for all activations, fill codes, and timer reset codes. The trial court also concluded that (1) "[t]he timers contained within the software of [COAMs] purchased by [Dixie] from [Primero] are subject to limited license periods; and each of the software licenses issued to [Dixie] by [Primero] create a limited license period equivalent to the length of the timer in the software as contemplated/set forth in the Terms of Sale," and (2) the cross-default provision in section 4 (e) of the Terms of Sale is applicable such that "Primero has the authority to terminate all of Dixie's software license, or to decline to renew them at the end of their expiration period." Dixie appeals.

1. At the outset, we address the applicability of the Uniform Commercial Code ("UCC") to this case. Because the predominant element of the contract/contracts here was for the purchase of goods, i.e., COAMs and chipsets, we agree with the parties that this case is governed by Georgia's UCC, codified in OCGA Title 11.

Article 2 of the UCC "applies to transactions in goods." See OCGA § 11-2-102 ("[u]nless the context otherwise requires, this article applies to transactions in goods; it does not apply to any transaction which although in the form of an unconditional contract to sell or present sale is intended to operate only as a security transaction nor does this article impair or repeal any statute regulating sales to consumers, farmers, or other specified classes of buyers").[14] See also *Heart of Texas Dodge v. Star Coach*,

---

[14] Effective July 1, 2024, the legislature revised this Code section as follows:

(1) Unless the context otherwise requires, and except as provided in subsection (3) of this Code section, this article applies to transactions in goods and, in the case of a hybrid transaction, it applies to the extent provided in subsection (2) of this Code section.

(2) In a hybrid transaction:
 (a) If the sale-of-goods aspects do not predominate, only the provisions of this article which relate primarily to the sale-of-goods aspects of the transaction apply, and the provisions that relate primarily to the transaction as a whole do not apply.
 (b) If the sale-of-goods aspects predominate, this article applies to the transaction but does not preclude application in appropriate

12

255 Ga. App. 801, 802 (1) (567 SE2d 61) (2002) ("If a contract involves only the sale of goods, the UCC applies. If a contract involves the rendition of services, the UCC does not apply."). "When the predominant element of a contract is the sale of goods, the contract is viewed as a sales contract and the UCC applies[.]" *Star Coach*, 255 Ga. App. at 802 (1). See also OCGA § 11-2-105 (1) (defining "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8 of this title), and things in action"); *Paramount Contracting Co. v. DPS Indus.*, 309 Ga. App. 113 (709 SE2d 288) (2011) ("[w]hen a transaction involves both the sale of a good and the provision of services or labor, whether the transaction is governed by Article 2 depends upon the 'predominant purpose' of the transaction, . . . or, put another way, the thrust of the transaction as

---

circumstances of other law to aspects of the transaction which do not relate to the sale of goods.

(3) This article does not:
   (a) Apply to a transaction that, even though in the form of an unconditional contract to sell or present sale, operates only to create a security interest; or
   (b) Impair or repeal a statute regulating sales to consumers, farmers, or other specified classes of buyers.

it would exist in the minds of reasonable parties") (citations and punctuation omitted) (physical precedent only). Compare *Systems Unlimited v. Cisco Systems*, 228 Fed. Appx. 854, 859 (II) (11th Cir. 2007) ("[t]he sale of intellectual property, [including software,] which is what is involved here, is not a transaction in goods[; t]hus the UCC does not apply").

Moreover, as our Supreme Court has observed, "[w]hen difficulties in interpreting the UCC arise, it shall be liberally construed and applied to promote its underlying purposes and policies." (Punctuation omitted.) *Ole Mexican Foods v. Hanson Staple Co.*, 285 Ga. 288, 289 (676 SE2d 169) (2009), citing OCGA § 11-1-102 (1) (currently codified at OCGA § 11-1-103 (a)). Even though the purchase of software was involved in the transactions between the parties, we nonetheless find that the predominant purpose of the transaction was the purchase of goods; thus, the UCC applies. Having determined that the UCC applies, we now turn to the parties' arguments, namely their dispute as to whether the Terms of Service became part of the parties' contract/contracts[15] under the UCC.

---

[15] As Dixie notes in its brief, "[t]he parties agree that each transaction is a separate contract."

2. In its sole enumeration of error, Dixie contends that because Section 2-207 governs the purchase and sales process between the parties, the trial court erred in concluding as a matter of law that the Terms of Sale did not materially alter the parties' unconditional contracts and become part of those contracts. Primero, in turn, asserts several arguments in opposition to Dixie's contention. First, Primero contends that Section 2-207 does not apply because this is not a "battle of the forms"; instead, the signing of a credit card authorization form by Dixie's CEO on May 16, 2016, agreeing to be bound by the Terms of Service, amounted to a binding modification under OCGA § 11-2-209 of any alleged oral agreements between the parties. Second, even without the signed form, the invoices are the final written expression of the parties' sales agreement under OCGA §§ 11-2-201 and 11-2-202 ("Section 2-201" and "Section 2-202"), and Georgia's long-standing interpretation of those Code sections as set forth in *Ready Trucking v. BP Exploration & Oil Co.*, 248 Ga. App. 701, 704 (2) (548 SE2d 420) (2001). And, third, even under Section 2-207, the Terms of Sale apply because (1) Dixie accepted those terms by repeatedly keeping Primero's products and (2) the Terms of Service did not materially alter the prior agreement between the parties.

(a) *The trial court's ruling.* In its order, the trial court explained as an initial matter that

the record [in this case] demonstrates that some sales (sale invoices in 2013 through February 2014) do not make any references to additional charges, nor do they incorporate any Terms of Sale. Other invoices incorporate Terms of Sale; but different versions of the Terms of Sale existed during different transactions between the parties. Finally, the evidence demonstrates that a group of invoices issued between approximately September 2014 and January 2016 contain language that indicates [Primero] would not charge activation or renewal fees for software ("will not charge" language). Notwithstanding the above facts, a review of the evidence reveals that [Primero] did not begin charging fees for refill codes for the software licenses purchased by [Dixie] until June 15, 2017. The evidence further demonstrates that the software contained in any boards/equipment purchased from [Primero] by [Dixie] would have contained timers which would have had to be reset with refill codes; and the software licenses associated with such would have had to have been renewed due to the expiration of the timer codes within the software (typically after one year). Consequently, any of the software purchased pursuant to the invoices which contained no reference to Terms of Sale, or pursuant to the invoices which referenced the "will not charge" language would have logically expired (and new software licenses created) by the time [Primero] first started charging fees. As such, the absence of language regarding the applicability for fees, or the "will not charge language" in earlier invoices are not relevant to the

present software licensed to [Dixie] by [Primero]. The evidence is insufficient to establish that [Primero] charged any fees whatsoever for any software covered by those earlier invoices.

(Footnote omitted.) The trial court then went on to declare that all 290 software licenses in Dixie's possession are bound by the Terms of Sale. In so declaring, the trial court rejected Dixie's reliance on Section 2-207, and ruled that

the [jury's] award of damages to [Primero] on its breach of [contract] claim against [Dixie] (which was not challenged on appeal), demonstrates the jury's determination that the Terms of Sale were at least applicable to some of the sales transactions between the parties; and that the Terms of Sale authorized [Primero] to charge for activations (new activations and re-activations), fill codes, and timer reset codes.[16]

---

[16] Primero contends that the trial court's finding "that the jury must have found [that] the Terms of Sale governed at least some of the parties' transactions" aligns with Primero's position that, as a matter of law, the Terms of Sale apply to all software transactions at issue. This finding by the trial court echoes a statement made by this Court in *Primero I*: "Based on the jury's award of breach of contract damages to Primero, the jury must have concluded that the Terms of Sale were applicable to at least some of the sales transactions between the parties[.]" (Footnote omitted.) Slip Op. at 14 (2) (a). As the trial court noted in its order, Primero seeks a declaratory judgment as to "all 290 software licenses currently in [Dixie's] possession." But, the statement made by this Court and echoed by the trial court only relates to some of the parties' transactions. Additionally, in the "Amended Pre-trial Order," Primero sought the following: Dixie "currently owes [Primero] a total of $28,937.70 for miscellaneous purchases, repairs, and software license or service fees related to [Dixie's] purchases from [Primero], and without justification has refused [Primero's]

The trial court then concluded that

> each transaction between the parties during the relevant time period are
> bound by the . . . Terms of Sale; which were made part of the contract of
> the parties pursuant to, and in alignment with, the requirements of
> OCGA § 11-2-201. The transactions between these parties were
> confirmed by a "writing" as required by the statute (the writing being
> the invoices which incorporate the Terms of Sale, and the authorization
> signed by [Dixie] which contains an assent to be bound by the Terms of
> Sale); said writing confirmed the sale of goods being bought and sold;
> and [Dixie] failed to object to any said Terms after receipt of the
> invoices.

The question thus becomes whether the trial court erred when it agreed with

Primero that Sections 2-201 and 2-202 govern in this case. Primero contends that the

---

demands for payment." And, the trial court charged the jury that Primero "claims
that [Dixie] owes it money damages for its [counter]claim for breach of contract in
which it claims [Dixie] owes money for its outstanding invoices on purchases and/or
services provided to include repairs and software license or service fees."
Accordingly, we find no merit in Primero's contention that the outcome of this case
should somehow be governed by the jury verdict. See *Strong v. Wachovia Bank of Ga.,
N.A.,* 215 Ga. App. 572, 575 (4) (451 SE2d 524) (1994) (courts should not speculate
as to the "fact-findings underpinning [a] verdict").

trial court did not and that this case is controlled by *Ready Trucking*.[17] Dixie, on the other hand, contends that *Ready Trucking* should be revisited because it did not correctly apply Sections 2-201 and 2-202. Because this is an appeal from a declaratory judgment, we "review the trial court's conclusions of law de novo, but will affirm the trial court's findings of fact under the any evidence standard." (Citations and punctuation omitted.) *Phelps v. Phelps*, 370 Ga. App. 89 (894 SE2d 496) (2023). Applying this standard of review, we agree with Dixie that the trial court erred.

(b) *Relevant provisions of the UCC*. Section 2-201 of the UCC "establishes a statute of frauds for the sale of goods [and] does not set forth the requirements necessary to prove the formation of a contract for the sale of goods[.]" Anderson, Uniform Commercial Code, § 2-201:2 (3d. ed. 2023). Importantly, Section 2-201 "does not state how a written contract for the sale of goods must be drawn nor what provisions it must contain." Id. Instead, "it states when a contract for the sale of goods must be evidenced by a writing and under what circumstances such a contract is enforceable even though it is not so evidenced." Id.

---

[17] Although the trial court did not cite *Ready Trucking*, it appears to have followed its reasoning.

The statute of frauds is designed as a safeguard against sharp commercial practices. The object of this section is to require a writing that will afford a basis for believing that the oral evidence offered rests on a real transaction and to ensure the valid existence of a contract. The statute of frauds is not designed to prohibit the enforcement of oral contracts, but only to bar the false claim that there was an oral contract when, in fact, no contract existed.

(Citations omitted.) Id. at § 2-201:4. Thus, when Section 2-201 has been complied with, the statute of frauds is eliminated as a defense. See id. at § 2-201:15. In sum, Section 2-201 "merely determines whether a contract is enforceable as against the defense of the statute of frauds; it does not, in any way, control or state the terms of the contract." Id. "[I]t is still necessary for the person claiming the benefit of the contract to establish that, in fact, there was a contract and to establish its terms." Id. This is where Section 2-207 comes into play.

Section 2-207 provides as follows:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

    (a) the offer expressly limits acceptance to the terms of the offer;

    (b) they materially alter it; or

    (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this title.

OCGA § 11-2-207. Where there is "a dispute as to whether an additional term is part of [a] contract[,] . . . the matter is controlled by [Section] 2-207 and not by [Section] 2-201." (Footnote omitted.) Anderson, Uniform Commercial Code, § 2-201:29 (noting as well that "a dispute involving additional terms does not present a statute of frauds problem"). See also *Eagle Jets v. Atlanta Jet*, 321 Ga. App. 386, 392 (2), n.5 (740 SE2d 439) (2013), citing *Step-Saver Data Systems v. Wyse Technology*, 939 F2d 91, 99 (II) (A) (3rd Cir. 1991) ("Under the UCC, where the fact of an agreement is not

21

in doubt, the contract will be found to include all terms upon which . . . the parties agree plus additional terms allowed pursuant to the UCC. OCGA § 11-2-207 (3). In other words, UCC § 2-207 establishes a legal rule that proceeding with a contract after receiving a writing that purports to define the terms of the parties' contract is not sufficient to establish the party's consent to the terms of the writing to the extent that the terms of the writing either add to, or differ from, the terms detailed in the parties' earlier writings or discussions."). Indeed, as explained in the Official Comments to the UCC,

> [u]nder this Article a proposed deal which in commercial understanding has in fact been closed is recognized as a contract. Therefore, any additional matter contained in the *confirmation* or in the acceptance falls within subsection (2) and must be regarded as a proposal for an added term unless the acceptance is made conditional on the acceptance of the additional or different terms.

(Emphasis supplied.) OCGA § 11-2-207, Official Comment 2.[18] See also *Aceros Prefabricados, S.A. v. TradeArbed*, 282 F3d 92, 98 (2nd Cir. 2002); *Packgen v. Berry*

---

[18] "In order to determine the meaning and purpose behind the enactment of a Georgia Commercial Code provision that is taken verbatim from the UCC, we turn to the UCC Official Comments for assistance." (Citation and punctuation omitted.) *Coleman v. DaimlerChrysler Svcs. of North America*, 276 Ga. App. 336, 339, n.3 (623 SE2d 189) (2005).

*Plastics Corp.*, 973 FSupp.2d 48, 63-64 (III) (C) (2) (a) (D. Maine 2013). As the

Second Circuit explained in *Aceros*, under Section 2-207 of New York's Commercial

Code, which is identical to OCGA § 11-2-207,

> an expression of acceptance or written confirmation that sets forth terms
> in addition to those initially agreed upon will not defeat formation of a
> binding contract. Instead, a contract will be found and the additional
> terms (in this case, the General Conditions of Sale, including the
> arbitration clause) are then treated as "proposals" for addition to the
> contract. This analysis applies to both expressions of acceptance that
> form the contract, . . . and written confirmations of agreements already
> reached[.]

(Citations and punctuation omitted.) 282 F3d at 98 (citing Official Comment 2 to

section 2-207 of New York's UCC).

(c) *Which section of the UCC applies here*. Primero contends that our decision in

*Ready Trucking* applies here and that the trial court correctly applied Section 2-201

rather than Section 2-207 because this is not a battle of the forms.[19] Primero also

---

[19] As noted previously, in response to Dixie's enumeration, Primero contends that the signing of a credit card authorization form by Dixie's CEO on May 16, 2016, agreeing to be bound by the Terms of Service, amounted to a binding modification under OCGA § 11-2-209 of any alleged oral agreements between the parties. We do not see where Primero raised this specific argument in its claim for declaratory judgment; Primero does not point out where it was raised; and the trial court does not

23

contends that Sections 2-201 and 2-202 apply here because Dixie never objected to the invoices. Primero's contentions are wrong for three reasons.

(i) First, neither party disputes the existence of a contract/contracts. And, as made clear, supra, "[t]he statute of frauds does not apply when it is conceded that there is a contract and the dispute goes only to the terms of the contract." Anderson, Uniform Commercial Code, § 2-201:27. Cf. *Henry v. Blankenship*, 284 Ga. App. 578, 581 (2) (644 SE2d 419) (2007) (oral contract for sale of goods was enforceable under Section 2-201, the statute of frauds). Similarly, Dixie's failure to object to the invoices does not bar it from disputing the terms contained therein;

reference OCGA § 11-2-209 in its order. Although Primero mentioned the credit card authorization form in its brief in support of motion for partial summary judgment filed June 14, 2019, it did not invoke OCGA § 11-2-209. Additionally, its brief in support of its declaratory judgment action makes no mention of the credit card authorization form or OCGA § 11-2-209. Pretermitting the merit of Primero's contention, this Court will neither cull the record to verify that a party properly raised an argument below, see *Burt, Burt, & Rentz Retirement Pension Trust v. Dougherty County Tax Assessors*, 256 Ga. App. 648 (1) (569 SE2d 557) (2002), nor consider a legal issue not raised below. See *Seeley v. Seeley*, 282 Ga. App. 394, 397 (2) (638 SE2d 837) (2006) (refusing to consider legal issue raised by appellee for the first time on appeal; "[f]airness to the trial court and to the parties demands that legal issues be asserted in the trial court") (citation and punctuation omitted). See also *Amos v. Creative Consulting Svcs.*, 370 Ga. App. 676, 686 (1), n.6 (898 SE2d 856) (2024) (refusing to consider issue for the first time because appellee failed to assert it below as a basis for summary judgment).

instead, it merely prevents Dixie from asserting the statute of frauds as a defense.[20]

The dispute in this case concerns the terms of the contract/contracts, and whether the Terms of Service became part of the parties' contract/contracts. As explained, supra, any dispute involving whether additional terms are part of the parties' contract/contracts is controlled by Section 2-207 and not Section 2-201.[21]

---

[20] As Dixie correctly points out in its brief, "evidence of how the parties' contracts were formed is undisputed and unequivocal: [Dixie] would call [Primero] to order equipment for an agreed upon price; [Dixie] would go to [Primero's] location to pay and pick up the equipment; and only after payment was made, would [Primero] then provide [Dixie] an invoice. . . . These invoices were the 'written confirmation' that [Section] 2-207 contemplates." As explained in White, Summers, & Hillman, Uniform Commercial Code, § 2:19 (6th ed.), section 2-207 (1) "uses the word 'confirmation.' And Comment 1 to § 2-207 indicates that the drafters did intend at least that § 2-207 (1) and (2) apply where an agreement has been reached orally and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and adding terms not discussed." (Citation and punctuation omitted.) Id. Additionally, section 207 (1) "speaks of a confirmation that operates as an acceptance despite the fact that it states terms additional to or different from those agreed upon. Prior oral-agreement cases in which one or both of the parties follow up with a confirming form are therefore to be run through § 2-207 (1) and (2) with whatever results those subsections and the rest of Article 2's provisions on terms dictate." Id.

[21] See also Official Comment 3 to Section 2-207:

Whether or not additional or different terms will become part of the agreement depends upon the provisions of subsection (2). If they are such as materially to alter the original bargain, they will not be included

25

(ii) Second, as explained by another court,

there does not have to be a classic "battle of the forms" for [S]ection 2-207 (1) and (2) to apply to a contractual dispute, as: Notwithstanding its popular characterization as the "battle of forms" section, the original [S]ection 2-207 was not limited to "battle of the forms" situations. Where, for example, an oral contract was followed by the issuance of one form containing terms that were not mentioned in the oral agreement, [S]ection 2-207 clearly applied. The "battle" in such cases was one between the terms in one form and the terms of the oral contract, but not between two forms.

(Punctuation omitted.) *Packgen*, 973 FSupp.2d at 63 (III) (C) (2) (a), citing Corbin on Contracts § 3.37A (2013); Murray on Contracts § 50 [D] (2011). There is thus no merit in Primero's contention that Section 2-207 does not apply because this is not a battle of the forms.

(iii) Third, this Court's analysis in *Ready Trucking* is flawed and must be overruled. In *Ready Trucking*, this Court concluded that Sections 2-201 and 2-202 resolved a breach of contract dispute between merchants. 248 Ga. App. at 703 (2). In

unless expressly agreed to by the other party. If, however, they are terms which would not so change the bargain they will be incorporated unless notice of objection to them has already been given or is given within a reasonable time.

26

that case, Ready (a motor common carrier) sued BP (a fuel seller) for breach of contract, alleging that BP agreed to sell Ready fuel at a price that included all applicable sales taxes. Id. at 701-702. But each of the invoices sent to Ready by BP as confirmation of each of the approximately 150 transactions between the parties revealed that BP never collected and paid the State and local sales taxes. Id. at 702. Ready paid the back taxes and associated penalties and then sued BP for breach of contract, alleging that BP agreed to sell Ready fuel at a price that included all applicable sales taxes. Id. at 701-702. Both parties filed motions for summary judgment. Id. at 701. The trial court granted BP's motion and denied Ready's motion and this Court affirmed. Id. at 702, 704 (2). Applying Sections 2-201 and 2-202, this Court concluded that the invoices sent to Ready by BP and unobjected to by Ready became "the final expression of [the parties'] agreement with respect to such terms as are included therein [and the terms] may not be contradicted by evidence of any prior agreement." (Citation and punctuation omitted.) Id. at 704 (2), quoting OCGA § 11-202. And that "[t]he invoices constitute an enforceable writing confirming the terms of the agreement, and they constitute an agreement between the parties that the two missing taxes would not be collected and remitted by BP." Id.

But, our holding in *Ready Trucking* has been criticized by courts and commentators on the ground that "the application of OCGA § 11-2-201 (2) to a case, in which the existence of an agreement is undisputed may be at odds with the plain language of OCGA § 11-2-201 and § 11-2-202." *ABV Electronics v. Ceton Corp.*, No. 1:12-CV-2178-ODE, 2014 WL 12573015, at *6 (N.D. Ga., March 25, 2014).[22] See *Ardus Medical v. Emanuel County Hosp. Auth.*, 558 FSupp.2d 1301, 1310-1311 (III) (C) (S.D. Ga. 2008). Indeed, as a district court pointed out in noting its reservations regarding our holding in *Ready Trucking*:

> Scholars and courts in the Eleventh Circuit have criticized the holding, with one publication stating: The court, in not understanding the effect

---

[22] As the *ABV* court noted, Official Comment 3 to Section 2-201 buttresses this conclusion as follows:

> Between merchants, failure to answer a written confirmation of a contract within ten days of receipt is tantamount to a writing under subsection (2) and is sufficient against both parties under subsection (1). The only effect, however, is to take away from the party who fails to answer the defense of the Statute of Frauds; the burden of persuading the trier of fact that a contract was in fact made orally prior to the written confirmation is unaffected.

(Citation, punctuation, and emphasis omitted.) 2014 WL 1253015, at *6.

of UCC § 2-201 (2), held that since both parties were merchants, the failure of the buyer to object to the invoice made the terms of the invoice binding on the buyer. The court failed to understand that the only consequence under UCC § 2-201 (2) of the buyer's failure to respond to a confirmation is that the buyer could not assert the statute of frauds. It does not, as the court claimed, make the confirmation a final expression of the parties' agreement for purposes of UCC § 2–202.

*B-TEC Enterprises v. Resolute Tissue*, 2:21-CV-135-RWS, 2022 WL 18638817, at *4 (II) (A) (N.D. Ga., January 3, 2022) (finding forum selection clauses in parties' invoices enforceable under *Ready Trucking* and granting motion to transfer venue on ground that the federal court was required to follow this Court's decision in *Ready Trucking* where the "state's highest court has not spoken on an issue"), citing Anderson, Uniform Commercial Code, § 2-201:233.

After considering the applicable principles of stare decisis, see generally *Cook v. State*, 313 Ga. 471, 485 (3) (a) (870 SE2d 758) (2022), we conclude that *Ready Trucking* must be overruled because its analysis is flawed. It follows, therefore, that the trial court erred in finding Section 2-207 inapplicable and concluding that "each transaction between the parties during the relevant time period are bound by

[Primero's] Terms of Sale[,] which were made part of the contract of the parties pursuant to, and in alignment with, the requirements of OCGA § 11-2-201."

(d) *The Terms of the Parties' Agreement.* Having concluded that Section 2-207 applies to this case and that the trial court erred in finding otherwise, we must next determine whether the Terms of Sale became part of the parties' contracts. Dixie contends that because the Terms of Sale materially altered the parties' oral contracts for COAM and chipset purchases, as a matter of law, they did not become part of the parties' contracts.

Section 2-207 instructs that as between merchants, the proposed additional terms become part of the contract, unless they fall within one of the exceptions contained in subsection (2). The only exception relevant to this case is subsection (2) (b), which provides that additional terms in a written confirmation presumptively become part of a contract for the sale of goods unless they materially alter it. See OCGA § 11-2-207 (1), (2) (b). While our research has not revealed a Georgia case addressing what constitutes a material alteration under Section 2-207, the Official Comments to Section 2-207 explain that a clause "materially alter[s]" a contract if it would "result in *surprise or hardship* if incorporated without express awareness by the

30

other party[.]" (Emphasis supplied.) OCGA § 11-2-207, Official Comment 4. See

*Packgen*, 973 FSupp.2d at 66 (III) (D) (2). See also *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F3d 440, 448 (II) (D) (3rd Cir. 2003); *Bayway Refining Co. v. Oxygenated Marketing and Trading A.G.*, 215 F3d 219, 224 (A) (2) (2nd Cir. 2000); *Schulze and Burch Biscuit Co. v. Tree Top, Inc.*, 831 F2d 709, 712-713 (II) (7th Cir. 1987); Anderson, Uniform Commercial Code, § 2-207:75 (noting that "[t]he mere fact that the additional term does not 'surprise' the other party does not establish that it is not material, since the term may result in a hardship instead").

Whether an additional term materially alters a contract for the purposes of Section 2-207 (2) (b) is a question of fact for the trial court. See *Transamerica Oil Corp. v. Lynes, Inc.*, 723 F2d 758, 765 (III) (10th Cir. 1983); *Dorton v. Collins & Aikman Corp.*, 453 F2d 1161, 1169 (II) (6th Cir. 1972). Indeed, the majority of federal courts "reviewing whether an addition to a contract constitutes a material alteration hold that it depends on the unique facts of every case." *American Ins. Co. v. El Paso Pipe and Supply Co.*, 978 F2d 1185, 1190 (A) (10th Cir. 1992), citing, inter alia, *Luedtke Engineering Co. v. Indiana Limestone Co.*, 740 F2d 598, 600 (II) (7th Cir. 1984) (determining whether a term results in surprise or hardship "requires the trial court

to make a factual evaluation of the parties' position in each case"); *N & D Fashions v. DHJ Indus.*, 548 F2d 722, 726 (I) (8th Cir.1976). See also *Standard Bent Glass*, 333 F3d at 448 (II) (D); *Aceros*, 282 F3d at 100-101. The test for materiality

> includes both a subjective element of what a party actually knew and an objective element of what a party should have known. A profession of surprise and raised eyebrows are not enough. Instead, to carry its burden the nonassenting party must establish that, under the circumstances, it cannot be presumed that a reasonable merchant would have consented to the additional term.

(Punctuation omitted.) *Standard Bent Glass*, 333 F3d at 448 (II) (D), citing *Aceros*, 282 F3d at 100. See *Packgen*, 973 FSupp.2d at 66 (III) (D) (2) ("[c]onsiderations relevant to the issue of surprise include the parties' prior course of dealing and the number of written confirmations that they exchanged, industry custom and the conspicuousness of the term") (citation and punctuation omitted). See OCGA § 11-1-303; *American Ins.*, 978 F2d at 1191 (A) (in addition to prior course of dealing, a trial court should also consider "absence of industry custom" and "whether the addition was clearly marked on the written confirmation"); *Schulze and Burch*, 831 F2d at 714 (II) ("[t]he UCC gives even greater weight to a course of dealing than to usage of trade in construing the language of the contracting parties: when the two conflict, 'course of

dealing controls usage of trade'") (citation omitted); *Luedtke*, 740 F2d at 600 (II) ("[e]vidence of prior dealings was admissible here to help supplement the terms of the contract").

Because the trial court in this case applied the wrong section of the UCC in its order, it was not able to consider the factual issues necessary to determine whether the Terms of Sale materially altered the parties' contract. We, therefore, vacate the trial court's order and remand the case for the trial court to apply Section 2-207, and determine whether the Terms of Sale materially altered the parties' contract/contracts based upon further findings of facts appropriate to such a determination. See *Serluco v. Taggart*, 357 Ga. App. 296, 299 (2) (850 SE2d 483) (2020) (vacating trial court's order and remanding case to the trial court to reconsider petition under proper legal standard). See also *American Ins.*, 978 F2d at 1191-1192 (A) (where trial court failed to indicate any factual basis for its ultimate conclusion that provision was not a material alteration, remand was required for trial court to apply appropriate criteria and make missing findings of fact); *Dorton*, 453 F2d at 1169 (II) (remanding case where "question of whether the arbitration provision materially altered the oral offer under [Section] 2-207 (2) (b) is one which can be resolved only

by the District Court on further findings of fact"). Compare *Fairfield-Noble Corp. v. Pressman-Gutman Co.*, 475 FSupp. 899, 902 (S.D.N.Y. 1979) (under New York law, arbitration clause is a "per se material alteration of a contract" under Section 2-207); *Maxon Corp. v. Tyler Pipe Indus.*, 497 NE2d 570, 576 (Ind. Ct. App., September 15, 1986) (indemnification clause in an invoice was a material alteration as a matter of law and, therefore, did not become part of contract).

*Judgment vacated and case remanded with direction. Dillard, P. J., and Padgett, J., concur.*