## S00A1264. SULLIVAN v. SULLIVAN.
(539 SE2d 120)

HINES, Justice.

Sarah T. Sullivan ("Sarah"), propounder of a will signed by her late husband, Leo Sullivan, appeals from the judgment invalidating the will. She contends that the evidence did not authorize the jury to find that the decedent lacked testamentary capacity and was under undue influence when he executed the will, and that the court did not properly charge the jury. For the reasons which follow, we affirm.

Leo died on August 11, 1997 after a year-long battle with cancer; he and Sarah were married shortly after he was diagnosed. For the last weeks of his life, Leo was mainly bedridden and took strong drugs, including narcotics, to manage his pain. On July 31, 1997, less than two weeks before his death, his attorney, Barbara Martin, went to his home bearing two wills she had prepared, reflecting slightly different alternatives. Martin was concerned about Leo's condition and capacity to make a will and asked to meet with him alone. During this conversation, Leo identified his first wife, whom he divorced 20 years previously, as his current wife; stated that he was a carpenter when, in fact, he had been a test pilot during his working life; was unsure whether he owned real property; and could not identify his desired beneficiaries. When Martin specifically asked how he wanted to devise his property, he said he wished to leave everything as it was. In answer to a question about a specific real property asset, he stated that he wished the income to go to his children; the drafted will had the income going to Sarah. Later he also mentioned giving property to "the Sisters of Charity" and a cash devise to his former wife.[1]

Martin left Leo's bedroom and spoke with Sarah about Leo's vacillation about the disposition of his property. Martin was then surprised when, in just a few minutes, Sarah entered the living room with Leo dressed and seated in a wheelchair; Sarah stated that she did not care if the will was contested, it had to be signed that day, that it was now or never. Martin expressed her concerns to all present about Leo's inconsistency as to the disposition of certain of his property, and that his desires might not be reflected in the drafted will. After some discussion regarding the tax consequences as to one of the devises, Leo executed the will. The will was not read to Leo, nor did Leo read either proposed will Martin brought. Later that day, Martin memorialized the events and her concerns in a document she entitled "Memo to File in Anticipation of Litigation."

Signing the will left Leo considerably weakened and he was

---

[1] No such bequests are in the signed will.

taken back to bed. Once there, Sarah presented him with three additional documents to sign, one of which was an amendment to the couple's August 1996 prenuptial agreement permitting Sarah to receive 75 percent of Leo's individual retirement account; approximately six weeks earlier, Sarah filled out a form, which Leo signed, naming her as beneficiary of 75 percent of the account.

The will was offered for probate and one of Leo's sons filed a caveat. The matter was tried before a jury and, using special verdict forms, the jury specifically found that Leo did not have the testamentary capacity to make a will at the time the propounded will was executed, and that the propounded will was the result of undue influence by Sarah.

1. Sarah contends that there was no evidence to support the jury's finding of lack of testamentary capacity. Leo had testamentary capacity to make a will if he understood that the will had the effect of disposing of his property at the time of his death, was capable of remembering generally what property was subject to disposition by will, was capable of remembering those persons related to him, and was capable of expressing an intelligent scheme of disposition. *Quarterman v. Quarterman*, 268 Ga. 807 (1) (493 SE2d 146) (1997). A trial court must allow the jury to determine capacity where there is any genuine conflict of evidence regarding the testator's capacity. *Murchison v. Smith*, 270 Ga. 169, 172 (508 SE2d 641) (1998); *Mallis v. Miltiades*, 241 Ga. 404 (245 SE2d 655) (1978). "Only the testimony favorable to Caveator need be considered, because the sole question before us is whether there is sufficient evidence to sustain the jury's verdict. [Cit.]" *Horton v. Horton*, 268 Ga. 846, 847 (1) (492 SE2d 872) (1997). Evidence of incapacity at a reasonable time prior to and subsequent to a will's execution creates an issue of fact as to capacity at the time of execution. *Kievman v. Kievman*, 260 Ga. 853, 853-854 (1) (400 SE2d 317) (1991).

Here, in addition to Martin's testimony and contemporaneously recorded concerns about Leo's capacity, there was expert evidence of Leo's incapacity from Leo's oncologist, who treated him throughout his illness, and a forensic psychiatrist and a forensic pathologist who both reviewed Leo's medical records. Also, Leo's daughter testified that in the weeks before executing the will, Leo hallucinated and believed that he was on a sailboat, that he had been kidnapped and was being held, that persons who were not there entered the room, and that he thought a plane had crashed outside his window.

Sarah argues that at the time of the will's execution, Martin determined that Leo was competent, even though she had doubts. However, while Martin may have resolved the conflicting evidence before her in favor of believing that Leo had the necessary capacity, the jury was not bound to reach the same conclusion based on the

evidence before it, which included evidence Martin did not have. In fact, Martin testified that she believed Leo's capacity fell into a "gray area" of competence, and that her judgment that he was competent was made quickly on the basis of a number of factors, but that she believed that if he was going to sign the will, he needed to do so that day, before his condition deteriorated further. She also testified that Sarah stated Leo was irrational in the weeks before the execution of the proffered will. This evidence also created an issue of fact as to capacity, requiring resolution by the jury.

2. Sarah argues that the trial court should have charged the jury that a lack of testamentary capacity may only be shown by a "total absence of mind" of the testator. See *Anderson v. Anderson*, 210 Ga. 464, 472 (80 SE2d 807) (1954). "It is a fundamental rule in Georgia that jury instructions must be read and considered as a whole in determining whether the charge contained error." (Citation and punctuation omitted.) *Hambrick v. State*, 256 Ga. 688, 690 (3) (353 SE2d 177) (1987). See also *Columbia County v. Doolittle*, 270 Ga. 490, 492-493 (2) (512 SE2d 236) (1999). And a trial court does not commit error where it refuses to give a confusing or misleading instruction. *Jones v. State*, 200 Ga. App. 519, 521 (2) (c) (408 SE2d 823) (1991).

Sarah's desired charge referring to a "total absence of mind" could mislead the jury into believing that only the loss of all intellect and reason would deprive the testator of testamentary capacity. The jury was properly charged, among other things, that "testamentary capacity is that which is necessary to enable the testator to have a deciding and rational desire regarding the disposition of his property"; that this desire must not be "the ravings of a mad man pursuing cravings of an idiot, [or] the childish whims of imbecility"; that the testator must understand "the nature of the testament"; that the testator is "capable of remembering generally the property subject to disposition, and the persons related to him . . . and also of conceiving and expressing . . . [an] intelligible scheme of distribution"; that "[o]ld age and weakness of intellect do not constitute incapacity"; and that it would suffice if "the testator has sufficient intellect to enable him to have a decided and rational desire as to the disposition of his property." See *Morgan v. Bell*, 189 Ga. 432, 435-436 (1) (5 SE2d 897) (1939). There was no error.

3. There was also sufficient evidence to submit the question of undue influence to the jury. Sarah contends that the evidence showed that, at most, she merely had an opportunity to exercise undue influence over Leo. See *Quarterman*, supra at 808 (2). A caveat based upon the ground of undue influence may be supported by a wide range of evidence, as such influence can seldom be shown except by circumstantial evidence. *Harvey v. Sullivan*, 272 Ga. 392, 394 (4) (529 SE2d 889) (2000); *Skelton v. Skelton*, 251 Ga. 631, 634 (5) (308

SE2d 838) (1983). The evidence showing Leo's lack of capacity is relevant to the issue of undue influence as well as capacity because the influence necessary to dominate a weak mind is less than that necessary to dominate a strong one. *Murchison*, supra at 171-172; *Skelton*, supra.

Sarah controlled much of the communication others had with Leo in his final weeks. During that time, he signed a document which she prepared, naming herself as beneficiary of 75 percent of his individual retirement account, an arrangement contrary to the couple's prenuptial agreement made less than a year before. On the same day that he executed the will, Leo signed without reading, and at Sarah's instance, the amendment altering the prenuptial agreement to accommodate her being named as a beneficiary, yet he had previously expressed surprise when advised that Sarah had been named as a beneficiary of the retirement account. On the day of the will's execution, Sarah got Leo out of bed to sign it despite his condition and insisted that the execution go forward regardless of the potential for a caveat, saying that it was "now or never." Furthermore, she spoke with Leo's oncologist on the telephone shortly before the signing and reported to Martin that the oncologist considered Leo to be competent if he was "more or less consistent," a characterization of the conversation that the oncologist disputes.

Sarah places great emphasis on the fact that, in a colloquy with counsel, the trial judge stated that were he the finder of fact, he would not find any undue influence on Sarah's part. Of course, as the trial judge correctly recognized, he was not the finder of fact and thus was called on merely to determine whether there was sufficient evidence to allow the jury to decide this issue, and he properly determined that there was such evidence.

4. Appellee's motion to dismiss the appeal and his motion for sanctions are denied.

*Judgment affirmed. All the Justices concur.*

DECIDED NOVEMBER 13, 2000.

*Barry L. Katz, Mark A. Scheinfeld*, for appellant.
*Roberts, Erck & Schklar, Edwin J. Schklar*, for appellee.

