**THIRD DIVISION**
**DOYLE, P. J.,**
**HODGES and WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 10, 2025**

# In the Court of Appeals of Georgia

A24A1463, A24A1642. BUCKELEW v. WOMACK et al.; and vice versa.

WATKINS, Judge.

At around 4:20 p.m. on October 26, 2015, 32-year-old Jonathan Buckelew arrived by ambulance to the emergency department of North Fulton Hospital after he experienced seizure-like activity and became unresponsive during a chiropractic neck adjustment. Although the hospital was a primary stroke center, Buckelew's brain stem stroke was not diagnosed until the following day, after the window of opportunity for a mechanical thrombectomy had passed. As a result of this delay in treatment, Buckelew has locked-in syndrome, requiring constant care.

Buckelew sued the chiropractor, the hospital (North Fulton Medical Center doing business as North Fulton Hospital, "NFMC"), the emergency department

physician (Dr. Matthew Womack), the radiologist, the ICU doctor, the ICU physician assistant (PA Christopher Nickum), the on-call neurologist, and related entities. A jury found Dr. Womack and the radiologist liable and awarded Buckelew $75 million in damages.

In Case Number A24A1463, Buckelew argues that the trial court erred in applying the gross negligence standard to PA Nickum, limiting evidence of ordinary negligence against NFMC, and failing to enter a partial directed verdict against NFMC. In Case Number A24A1642, Dr. Womack cross-appeals, contending that the trial court erred in denying his motion for directed verdict, instructing the jury on gross negligence, and allowing Buckelew to impeach Womack's expert with a prior statement. Dr. Womack also contends that the cumulative effect of the trial court's errors warrants a new trial. For the reasons set forth below, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the evidence shows that within 20 minutes of Buckelew's arrival in the emergency department, Dr. Womack ordered a CT scan and CT angiogram ("CTA") scan of Buckelew's head and neck. Although Dr. Womack listed stroke as a possible diagnosis on the

---

[1] See *Preferred Women's Healthcare, LLC v. Sain*, 367 Ga. App. 821, 822 (888 SE2d 599) (2023).

differential diagnosis, he suspected Buckelew was experiencing meningitis or encephalitis, which he discussed in a brief telephone consult with the on-call neurologist, Dr. Peter Futrell. According to Dr. Futrell, Dr. Womack did not mention that Buckelew had seen a chiropractor, that Buckelew experienced a second seizure-like event while Dr. Womack was performing a lumbar puncture, that Buckelew had undergone a CTA scan, or that the CTA scan showed a dissection of the arteries in Buckelew's neck.

Dr. Womack called the ICU and asked for an ICU consult; PA Nickum, who worked in the ICU, met with Dr. Womack, discussed Buckelew's case, and admitted Buckelew to the ICU at 8:20 p.m. The following morning, an ICU doctor examined Buckelew, ordered an MRI, and requested a neurology consult. After discovering the MRI showed that Buckelew had suffered a large dissection and stroke, the ICU doctor and Dr. Bernard Drexinger, a neurologist, started him on a blood thinner and sent the radiology images to Grady Hospital, which was a comprehensive stroke center. At this point, however, it was "well out of the timeline" for anything to make a difference in Buckelew's outcome.

At the end of the trial, the jury returned a verdict in favor of the chiropractor, NFMC, the on-call neurologist, and PA Nickum, but found that Dr. Womack and the radiologist were grossly negligent and that such gross negligence was a proximate cause of Buckelew's injury. The jury awarded Buckelew $9 million in past medical expenses, $20 million in future medical expenses, and $46 million for past and future pain and suffering. The jury apportioned 60 percent of the fault to Dr. Womack and 40 percent to the radiologist. Buckelew and Dr. Womack appeal from the final judgment and orders denying their motions for new trial.[2]

## Case No. A24A1463

1. Buckelew argues that the trial court erred in applying the gross negligence standard set forth in the emergency medical care statute (the "ER statute"), OCGA § 51-1-29.5, to PA Nickum and his employer, North Fulton Pulmonary Specialists, while Buckelew was in the emergency department. In Buckelew's view, the PA's actions while Buckelew was in the emergency department should have been judged

---

[2] The radiologist also filed a cross-appeal, but later filed a notice that Buckelew's claims against him had been resolved, and we granted permission for him to withdraw his appeal. See Court of Appeals Rule 41 (g).

under the ordinary negligence standard, rather than the heightened gross negligence standard.

The ER statute, enacted as part of the Tort Reform Act of 2005, reduces medical providers' potential liability in health care liability actions that arise from emergency medical care by imposing a heightened burden of proof on the plaintiff.[3] When the statute applies, a plaintiff must prove "gross negligence" by "clear and convincing evidence";[4] otherwise, the medical provider is subject to the ordinary negligence standard."[5]

After Buckelew rested his case, the trial court granted PA Nickum's renewed motion to apply the gross negligence standard to Nickum as a matter of law. Buckelew challenges that ruling, arguing that there was at least a factual dispute as to whether Nickum provided "emergency medical care" or merely "critical care" while Buckelew was in the emergency department. Specifically, Buckelew argues that, as a physician assistant, Nickum only provided "critical care," and there was evidence

---

[3] See generally *Gilemmo v. Cousineau*, 287 Ga. 7, 11-12 (3) (694 SE2d 75) (2010).

[4] OCGA § 51-1-29.5 (c).

[5] *Wilson v. Inthachak*, 372 Ga. App. 341, 344 (1) n.7 (904 SE2d 414) (2024).

that Buckelew was "stable" before his transfer to the ICU. According to Buckelew, the trial court should have let the jury decide whether the ER statute applied to PA Nickum.

"Emergency medical care" is defined in the ER statute as:

bona fide emergency services provided after the onset of a medical or traumatic condition manifesting itself by acute symptoms of sufficient severity, including severe pain, such that the absence of immediate medical attention could reasonably be expected to result in placing the patient's health in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part. The term does not include medical care or treatment that occurs after the patient is stabilized and is capable of receiving medical treatment as a nonemergency patient or care that is unrelated to the original medical emergency.[6]

This definition "reflects a legislative intent to provide greater protection from liability to physicians and health care providers who provide genuine emergency medical care. This interpretation is borne out by the second sentence of subsection (a) (5) which addresses when an 'emergency' dissipates."[7] "[W]hether the condition of

---

[6] OCGA § 51-1-29.5 (a) (5).

[7] *Abdel-Samed v. Dailey*, 294 Ga. 758, 763 (755 SE2d 805) (2014).

the patient meets the definition of 'emergency medical care' is an objective, rather than subjective, test."[8]

Buckelew's argument that he had stabilized within the meaning of the statute before Nickum ordered that he be transferred from the emergency department to the ICU is without merit. Although there was testimony that his vital signs were "stable," there is no dispute that Buckelew was still in need of "immediate medical attention" related to the original medical emergency.[9] The entire thrust of Buckelew's case was that his stroke was a medical emergency that required prompt diagnosis and treatment. Importantly, it is the patient's status of needing emergency care, not the

---

[8] *Nguyen v. Southwestern Emergency Physicians, P.C.*, 298 Ga. 75, 91 (2) (c) (779 SE2d 334) (2015).

[9] Compare *OB-GYN Assocs., P.A. v. Brown*, 357 Ga. App. 655, 661 (2) (849 SE2d 257) (2020) (reversing denial of summary judgment where experts agreed that newborn was suffering from a shoulder dystocia at the time of the treatment in question and that "a shoulder dystocia represents a medical and obstetrical emergency because if a shoulder dystocia cannot be overcome in a timely fashion the baby is at risk of anoxic brain injury and death") (punctuation omitted), with *Inthachak*, 372 Ga. App. at 350 (1) (b) (jury question whether radiologist provided emergency care where there was some evidence that the patient "was transported by non-emergency ambulance to the hospital; she was alert with mild cognitive deficiency upon arrival; her vital signs were normal and her symptoms were mild; her primary complaint was head and hip pain; and all of the tests, including the CT scan, were marked as routine priority").

provider's conclusion as to whether the patient needs such care, that determines whether the statute applies.[10]

Here, although Nickum was an ICU physician assistant, there is no dispute that he evaluated and made the decision to admit Buckelew to the ICU while Buckelew was still in the emergency department. At that time, Buckelew's condition was "serious," "he had a neurologic condition that was still active," and "he was undergoing a catastrophic neurologic insult." Accordingly, the trial court did not err in finding as a matter of law that the statute applied to Nickum's treatment of Buckelew in the emergency department.[11]

2. Buckelew contends that the trial court erred in limiting his presentation of evidence and argument in support of his ordinary negligence claims against NFMC.

---

[10] See *Bonds v. Nesbitt*, 322 Ga. App. 852, 855 (1) (747 SE2d 40) (2013) ("If a physician or health care provider mistakenly concludes that a patient has become "stabilized" and "capable of receiving medical treatment as a nonemergency patient" and therefore stops providing emergency care to that patient — notwithstanding that the patient still needs emergency care — and if the patient is injured or killed as a result of the withdrawal of emergency care, the physician or health care provider is entitled to claim the protection of the gross negligence standard.").

[11] Cf. *Howland v. Wadsworth*, 324 Ga. App. 175, 180-181 (2) (749 SE2d 762) (2013) (concluding there was a jury issue whether the patient was stabilized and capable of receiving medical treatment as a nonemergency patient where she was admitted as a "non-urgent" patient and was discharged after three hours).

Although Buckelew frames this as the trial court "effectively" granting a directed verdict, the crux of his argument is that the trial court improperly excluded those claims. "Where a court excludes claims due to their omission from the pretrial order, we will reverse that ruling only if the trial court abused its discretion."[12] We also review the trial court's decision to exclude evidence for clear abuse of discretion.[13]

In Count 12 of the complaint, Buckelew alleged that NFMC was (vicariously) liable for the negligence of its "nurses and staff" because the care provided by those individuals fell below the care ordinarily employed "by the nursing profession." And, in the pretrial order, Buckelew identified the issue of NFMC's negligence as whether its nurses violated the standard of care and whether this negligence caused or contributed to Buckelew's injuries. Specifically, he alleged that "[NFMC's] nurses repeatedly failed to obtain complete vital signs for Buckelew, failed to perform a neurological exam as ordered, failed to contact a physician to communicate

---

[12] *Schowalter v. Washington Mutual Bank*, 275 Ga. App. 182, 183 (1) (620 SE2d 437) (2005).

[13] *Rowe v. Tyson*, 361 Ga. App. 885, 887-888 (2) (864 SE2d 170) (2021).

Buckelew's worsening condition, and failed to communicate abnormal vital signs to a provider except for a notification to Nickum."

In her opening, Buckelew's attorney stated that NFMC's "stroke team" (Dr. Womack, Dr. Futrell, Dr. Waldschmidt, and PA Nickum) failed to communicate with each other and that Buckelew was the "responsibility" of NFMC's team. NFMC objected that there was no allegation NFMC was vicariously liable for the independent physicians. The trial court overruled the objection but subsequently agreed to issue a curative instruction. In preparing the instruction, the trial court reviewed the pretrial order and confirmed that "the only issue" regarding NFMC's liability pertained to the care provided by the ICU nurses. Ultimately, the trial court instructed the jury that NFMC "is liable, if at all, only for the action or inaction or conduct of the nurses in the intensive care unit[.]" Buckelew's counsel did not object to the instruction.

As NFMC points out in its response brief, the trial court relied on the pretrial order when resolving NFMC's objection to Buckelew's attempt to discuss other potential instances of hospital negligence. Under the Civil Practice Act, the pretrial order, once entered, "controls the subsequent course of the action unless modified at

10

the trial to prevent manifest injustice."[14] "The pretrial order has been likened to a rudder to the ship of litigation, and is intended to limit the claims, contentions, defenses, and evidence that will be submitted to the jury, thereby narrowing the course of the action, and expediting its resolution."[15] "If a claim or issue is omitted from the order, it is waived."[16] Generally, "unless the pretrial order is modified at or before trial, a party may not advance theories or offer evidence that violate the terms of the pretrial order."[17]

Here, Buckelew contended in the pretrial order that "North Fulton's nurses repeatedly failed to obtain complete vital signs for Mr. Buckelew, failed to perform a neurological exam as ordered, failed to contact a physician to communicate Mr. Buckelew's worsening condition, and failed to communicate abnormal vital signs to a provider except for a notification to Mr. Nickum." Buckelew did not allege claims of institutional error by NFMC directly, such as negligent training of non-employee

---

[14] OCGA § 9-11-16 (b).

[15] (Citations and punctuation omitted.) *Dept. of Human Resources v. Phillips*, 268 Ga. 316, 318 (1) (486 SE2d 851) (1997).

[16] (Citation and punctuation omitted.) *Eagle Jets, LLC v. Atlanta Jet, Inc.*, 321 Ga. App. 386, 400 (8) (740 SE2d 439) (2013).

[17] *Phillips*, 268 Ga. at 318 (1).

doctors regarding the hospital's stroke protocol, negligent failure to enforce the ICU admissions policy, negligent management of its IT systems, and slow CT image processing.

Even liberally construing the pretrial order in this case[18] and assuming without deciding that Buckelew did not waive this issue by failing to object after the curative instruction was given following the opening statements, the claim that NFMC was vicariously liable for the negligence of its nurses did not fairly raise the issue of NFMC's direct liability as an institution.[19] Accordingly, the trial court did not abuse its discretion in excluding this evidence.

---

[18] See *Appling v. State Farm Fire & Cas. Ins. Co.*, 348 Ga. App. 369, 371 (1) (823 SE2d 61) (2019) ("A pretrial order limits the issues for trial and controls the subsequent course of the action unless modified at trial to prevent manifest injustice. Nonetheless, a pretrial order should be liberally construed to allow the consideration of all questions fairly within the ambit of the contested issues.") (citation, punctuation, and emphasis omitted).

[19] Cf. *Ga. Trails & Rentals, Inc. v. Rogers*, 359 Ga. App. 207, 216 (3) (b) (855 SE2d 103) (2021) (where plaintiffs specifically alleged in pretrial order that defendants were "negligent and grossly negligent" in "several particulars," the order fairly raised the issue of gross negligence).

3. Buckelew argues that the trial court erred in failing to direct a verdict in his favor as to NFMC's "undisputed" violation of the standard of care because its nurses ignored his family's requests to talk to a doctor.

Buckelew's mother and wife testified at trial that they asked multiple times to see a doctor over the course of the night while Buckelew was in the ICU. The nurses, however, called PA Nickum, instead of a physician, to speak with the family.

Buckelew's nursing expert, Jennifer Adamski, PhD, testified that it would be appropriate for a nurse to get a physician assistant instead of a doctor if the family was comfortable speaking to him. In fact, she stated that "[i]t happens all the time[.]" She added, however, that if the family repeatedly asked the nurse to get a physician, a nurse's failure to do so would be a violation of the standard of care.

NFMC's nursing expert, Linda Lane, agreed that, if the nurse got the doctor's representative (here, PA Nickum) and the family was still unsatisfied and wanted to speak to a doctor, a nurse's failure to notify a physician would violate the standard of care.

Buckelew argues that, because there is no evidence in the record that a doctor was notified of the family's requests to speak with a physician, the trial court should

have entered judgment as a matter of law in his favor rather than allowing the issue to go to the jury.

"In determining whether the evidence warrants denial of a directed verdict motion, the evidence must be construed most favorably to the party opposing the motion, and the standard used to review the grant or denial of a directed verdict is the 'any evidence' test."[20] Here, we conclude that the trial court properly denied Buckelew's motion for a partial directed verdict because it was up to the jury whether to accept the expert opinions in whole or in part.[21] Importantly, the experts did not unequivocally testify that a nurse's failure to call a doctor upon request from a patient's family would always violate the standard of care. Instead, they testified that it was appropriate in some circumstances to have a physician assistant speak with the family; indeed, the plaintiff's own expert testified that this happened "all the time."

---

[20] (Citation and punctuation omitted.) *Phillips*, 268 Ga. at 322 (5).

[21] See *Byrd v. Med. Ctr. of Central Ga.*, 258 Ga. App. 286, 291 (2) (574 SE2d 326) (2002).

Thus, the jury had some evidence upon which it could conclude that it was reasonable for the nurses to have Nickum, rather than a doctor, talk to Buckelew's family.[22]

*Case No. A24A1642*

4. On cross appeal, Dr. Womack contends that the trial court should have granted his motions for directed verdict and judgment notwithstanding the verdict because Buckelew failed to show that his injuries were caused by the gross negligence of Womack. Specifically, Dr. Womack argues that: (a) Buckelew did not establish the applicable medical standard of care, (b) Womack acted with more than slight diligence, and (c) Buckelew failed to show causation.

As we discussed in Division 3, supra, "[o]n appeal from the denial of a motion for a directed verdict, we construe the evidence in the light most favorable to the party opposing the motion, and the standard of review is whether there is any evidence to support the jury's verdict. Questions of law are reviewed de novo."[23]

---

[22] See *Teklewold v. Taylor*, 271 Ga. App. 664, 667 (1) (b) (610 SE2d 617) (2005). See generally *Beach v. Lipham*, 276 Ga. 302, 304 (2) (578 SE2d 402) (2003) (holding that legal presumption that a medical professional provided due care does not vanish when a plaintiff introduces evidence to the contrary).

[23] (Citation and punctuation omitted.) *McCommons v. White*, 371 Ga. App. 93 (899 SE2d 731) (2024).

15

(a) Dr. Womack argues that Buckelew's expert in emergency department medicine and general medicine, Dr. Martin Lutz, never established what a reasonable degree of care and skill required, and instead offered only conclusory criticisms of Dr. Womack's conduct and expressed a mere difference in view.

"Gross negligence" is defined as the absence of "slight diligence," which is "that degree of care which every [person] of common sense, however inattentive he may be, exercises under the same or similar circumstances."[24]

> Applying this definition in the context of a medical malpractice action brought pursuant to OCGA § 51-1-29.5 (c), liability would be authorized where the evidence, including admissible expert testimony, would permit a jury to find by clear and convincing evidence that the defendants caused harm by grossly deviating from the applicable medical standard of care. As a general rule, when facts alleged as constituting gross negligence are such that there is room for difference of opinion between reasonable people as to whether or not negligence can be inferred, and if so whether in degree the negligence amounts to gross negligence, the right to draw the inference is within the exclusive province of the jury.[25]

---

[24] OCGA § 51-1-4.

[25] (Citations and punctuation omitted.) *Abdel-Samed*, 294 Ga. at 765 (3) (where plaintiffs submitted expert testimony that emergency room doctor and physician assistant did not meet the medical standard of care under like circumstances in their efforts to transfer a patient to a hand surgeon, the question of whether the defendants

16

Dr. Lutz opined with a reasonable degree of medical certainty that Dr. Womack grossly departed from the standard of care by failing to inform Dr. Futrell that Buckelew had been to a chiropractor earlier that day and that he (Womack) had ordered a CT angiogram looking for and possibly showing dissection; by not requesting that Dr. Futrell come to the hospital during this conversation and not calling Dr. Futrell back after Dr. Womack witnessed the second seizure-like event; and in failing to accurately document Buckelew's symptoms in the medical records. Given this testimony, the jury would have been authorized to find by clear and convincing evidence that Dr. Womack acted with gross negligence.[26]

(b) Dr. Womack next argues that Buckelew has failed to show that Womack did not abide by the standard of care. Dr. Womack maintains that he acted with more than slight diligence and that Buckelew failed to show that Womack "did nothing" to treat Buckelew.

---

acted with gross negligence was for a jury to determine).

[26] See OCGA § 51-1-29.5 (c); *Lowndes County Health Servs., LLC v. Copeland*, 352 Ga. App. 233, 241 (3) (834 SE2d 322) (2019) (issue of non-party doctors' gross negligence could go to jury where expert asserted that their breaches of care were egregious, resulting in the provision of astonishingly poor care to the patient in the emergency room).

In his response brief, Buckelew argues that Dr. Womack has waived this argument because he conceded on the stand that, if Futrell's account were true, that would constitute "gross negligence." However, "although generally a party may take advantage of admissions of the other party, the rule applies only to statements of *fact*, not to opinions or legal conclusions."[27] Thus, Womack's argument was not waived. Nonetheless, as discussed in Division 4 (a), the evidence permitted a jury to find by clear and convincing evidence that Womack caused harm by grossly deviating from the applicable medical standard of care.[28] Based on the evidence, including the expert testimony, the jury could find the absence of even "slight diligence."

(c) Dr. Womack also contends that Buckelew failed to show causation because Buckelew's expert witness, Dr. Raul Nogueira, opined only that Buckelew's injuries would have been less severe if he had received the "best care."

Dr. Nogueira, an expert in interventional neurology, general neurology, and general medicine, testified that, if Buckelew had received the medical treatment he

---

[27] (Emphasis supplied.) *Kothari v. Patel*, 262 Ga. App. 168, 175-176 (4) (585 SE2d 97) (2003).

[28] See *Nisbet v. Davis*, 327 Ga. App. 559, 571 (2) (760 SE2d 179) (2014).

had available at the time, he more likely than not would have had a better outcome.[29] Specifically, because Buckelew came to the hospital very early (within the "golden hour"), he was a candidate for both a TPA and a mechanical thrombectomy. Other factors supporting Dr. Nogueira's conclusion were Buckelew's age and that he had "very good collateral flow" (eight or nine out of ten on the BATMAN score[30]).

> An expert's opinion on the issue of whether the defendant's alleged negligence caused the plaintiff's injury cannot be based on speculation or possibility. It must be based on reasonable medical probability or reasonable medical certainty. In presenting an opinion on causation, the expert is required to express some basis for both the confidence with which his conclusion is formed, and the probability that his conclusion is accurate.[31]

---

[29] Specifically, Buckelew's score on the modified Rankin scale would have been between a zero and four instead of a five. According to Dr. Nogueira, a zero on the Rankin scale indicates no disability at all; "[a] four is a patient that essentially can even walk with some assistance versus a five is a patient that is fully dependent, typically bedridden, incontinent, requiring care 24/7."

[30] BATMAN (Basilar Artery on Computer Tomograph Angiography) is a ten-point score to identify patients most likely to benefit from mechanical thrombectomy.

[31] (Citation and punctuation omitted.) *Ga. Clinic, P.C. v. Stout*, 323 Ga. App. 487, 495 (5) (747 SE2d 83) (2013); see also *Zwiren v. Thompson*, 276 Ga. 498, 500-501 (578 SE2d 862) (2003) (discussing expert's role in presenting an opinion on causation).

Dr. Nogueria's testimony satisfied this burden. Dr. Womack focuses on Dr. Nogueira's opinion that the outcome would have been better if Buckelew had received the "best" care, which was the wrong standard under OCGA § 51-1-27. However, Dr. Nogueira clarified this testimony, stating that he had "little doubt, no doubt to the best of my scientific and medical knowledge that this would not have been the case, it's more likely than not had he received the medical treatment that he had available back in October of 2015." And there is no dispute that the treatment Dr. Nogueira identified (TPA and mechanical thrombectomy) were the same treatments that Dr. Futrell (the neurologist on call) and Dr. Drexinger (the neurologist who saw Buckelew the next morning) would have ordered had the stroke been diagnosed in time.

Buckelew thus provided some evidence showing that, if Dr. Womack had abided by the standard of care, Buckelew would have received treatment and, more likely than not, would have "been essentially fully independent." Because there was also evidence that Womack was grossly negligent, as discussed above, the trial court did not err in denying his motion for directed verdict.

5. Dr. Womack also complains the trial court's jury instruction on gross negligence was confusing and allowed the jury to return a verdict against him even if the jury found only that he was "negligent," rather than "grossly negligent."

"It is a fundamental rule in Georgia that jury instructions must be read and considered as a whole in determining whether the charge contained error."[32] "[W]here the charge as a whole substantially presents issues in such a way as is not likely to confuse the jury even though a portion of the charge may not be as clear and precise as could be desired, we will not disturb a verdict amply authorized by the evidence."[33]

Here, the trial court instructed the jury in part:

> As to the medical care provided while plaintiff was in the hospital's emergency department, the Plaintiff must prove gross negligence by clear and convincing evidence and the elements of causation and damages by a preponderance of the evidence.

---

[32] (Citations and punctuation omitted.) *Sullivan v. Sullivan*, 273 Ga. 130, 132 (2) (539 SE2d 120) (2000).

[33] (Citation and punctuation omitted.) *Delson v. Ga. Dept. of Transp.*, 295 Ga. App. 84, 88 (2) (a) (671 SE2d 190) (2008); accord *Thomas v. Alligood*, 358 Ga. App. 703, 706-707 (1) (b) (856 SE2d 80) (2021).

Gross negligence is the absence of even slight diligence. In general, slight diligence is the degree of care that persons of common sense, however inattentive they may be, use under the same or similar circumstances. In other words, gross negligence is equivalent to the failure to exercise even a slight degree of care or lack of the diligence that even careless persons are accustomed to exercise.[34] In the context of a medical malpractice action brought by a patient treated in an emergency room, gross negligence means substantial and grossly deviating from the applicable medical standard of care. Gross negligence can include acts or omissions to act.

The applicable medical standard of care is that degree of care and skill as under similar conditions and like surrounding circumstances is ordinarily employed by the profession generally.

If a healthcare provider in the treatment and care of a patient exercised that degree of care and skill ordinarily employed by the profession generally under similar conditions and like surrounding circumstances, then the healthcare provider would not be negligent or grossly negligent; therefore, there could be no finding of malpractice.[35] If, on the other hand, the healthcare provider should be substantially and grossly deviate from the requisite degree of care and skill, the healthcare provider would be grossly negligent.

. . .

---

[34] See Suggested Pattern Jury Instructions, Vol. I: Civil Cases (2007), § 60.030.

[35] See Suggested Pattern Jury Instructions, Vol. I: Civil Cases (2007), § 62.030.

A healthcare provider cannot be found grossly negligent based on an assessment of a patient's condition, which only later in hindsight proves to be incorrect so long as the initial assessment was made in accordance with the requisite degree of skill and care.[36]

Dr. Womack argues that the jury could have found that he was grossly negligent under these instructions if it determined that he failed to act "with the requisite degree of skill and care." Pretermitting whether Womack preserved this argument,[37] when we view the trial court's instructions as a whole,[38] "we cannot conclude that the jury was either confused or misled into believing it could find [Dr. Womack] liable under an ordinary-negligence standard."[39] The jury instructions, considered in their

---

[36] See Suggested Pattern Jury Instructions, Vol. I: Civil Cases (2007), § 60.030 ("In a medical malpractice action, a defendant cannot be found *negligent* on the basis of an assessment of a patient's condition that only later, in hindsight, proves to be incorrect as long as the initial assessment was made in accordance with reasonable standards of medical care.") (emphasis supplied); see also *Smith v. Finch*, 285 Ga. 709, 711 (1) (681 SE2d 147) (2009).

[37] See generally OCGA § 5-5-24 (a); *Clemons v. Atlanta Neurological Inst, P.C.*, 192 Ga. App. 399, 399-400 (1) (a) (384 SE2d 881) (1989).

[38] See *Hendley v. Evans*, 319 Ga. App. 310, 319 (2) (d) (734 SE2d 548) (2012).

[39] *Southwestern Emergency Physicians, P.C. v. Quinney*, 347 Ga. App. 410, 419 (2) (819 SE2d 696) (2018).

entirety, clearly advised that Dr. Womack could be liable only if he was grossly negligent.

Further, any perceived confusion in the jury instructions with regard to the applicable standard of care and burden of proof was effectively resolved in the verdict form that was given to the jury, which included the following first question: "Do you find by clear and convincing evidence that MATTHEW WOMACK, MD was grossly negligent, and find by a preponderance of the evidence that such gross negligence was a proximate cause of injury to Plaintiff?"[40] Accordingly, this claim of error presents no basis for a new trial.

6. Dr. Womack next argues that the trial court erred when it allowed Buckelew to "impeach" Womack's primary expert witness with unrelated statements.

Dr. Womack testified that a medical scribe was helping him take notes in the emergency room on the day in question and specifically that the scribe documented Womack's telephone conversation with Dr. Futrell (the on-call neurologist). The next day, Dr. Womack pulled up the note and added that he had discussed the head CT

---

[40] See *Howland*, 324 Ga. App. at 183 (4).

and findings of age-indeterminate dissection and advised Dr. Futrell that Buckelew experienced symptoms during a chiropractic visit.

After Dr. Womack's emergency-medicine expert, Dr. Matthew Delaney, explained that it was common practice and "totally appropriate" for an emergency-medicine physician to finalize records in this way, the following exchange took place on cross-examination:

> Q    [A]fter Dr. Womack learned [the next day that Buckelew had experienced a brain stem stroke], he went back into the medical record and he altered his note adding this additional information under the cause consult where he documented that he discussed the normal head CT and finding of age indeterminate versus congenital variations, et cetera, all of that new information was placed after he learned of the outcome. Is that right?
>
> A    Right. That's totally normal. If someone had called me and said, hey, you didn't do this thing that I would have thought you did and I said, oh, gosh, I did do that thing, then I would clarify my medical record, which is what he does.
>
> Q    But an E.R. physician, you agree with me, should never go back in after they know of the outcome and change the record to put in additional information. You know that, right?
>
> A    No, I don't agree with that at all. He should be truthful, but I think clarifying what you did is very reasonable, especially before you sign and finalize a note. 99 percent of my notes get changed before I finalize them.

And if somebody says, hey, that was a bad case, did you do this and I did, I think it's very reasonable. It's best practice to update your medical records . . . and have the most complete and honest medical records you can.

Over objection, Buckelew then impeached Dr. Delaney with a clip from a podcast that he co-hosted, "E.R. Cast," "Straight Talk About Emergency Medicine." In the 48-second clip played for the jury, Delaney said that adding or changing a plaintiff's medical record is a "death blow to any defense" if the medical provider is subsequently alleged to have committed malpractice. Dr. Delaney explained on redirect that the podcast was "med-u-tainment" and that, in the episode, he was talking about a case where there was "true alteration" of the medical record "several weeks down the road," which was "different than changing what you're going to put before you sign your note."

"Control of the nature and scope of cross-examination of a witness is a matter within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion."[41]

---

[41] *Latimore v. Dept. of Transp.*, 250 Ga. App. 360, 361 (1) (552 SE2d 439) (2001).

The trial court did not abuse its discretion by allowing Buckelew to ask Dr. Delaney questions about the statements made on his podcast. "While a witness may not be impeached because of a discrepancy as to a wholly immaterial matter, a witness may be impeached on a collateral issue which is indirectly material to the issue in the case."[42] Here, the trial court accepted Buckelew's argument that the prior podcast statements were inconsistent with the statements Dr. Delaney made on the stand and rejected Womack's argument that it was unduly prejudicial to use the podcast to cross-examine Dr. Delaney. Given that the prior statement was contradictory and that Delaney was provided an opportunity to explain his statement on redirect, Womack has failed to show abuse of discretion.[43]

---

[42] *Latimore*, 251 Ga. App. at 361 (1) (trial court did not abuse its discretion in allowing impeachment evidence that a physician expert witness's license had been suspended, even though the witness had already qualified as an expert, because the impeachment evidence that contradicted the physician's testimony examined weaknesses in his credentials and competency).

[43] See generally OCGA § 24-6-613 (b) ("[E]xtrinsic evidence of a prior inconsistent statement by a witness shall not be admissible unless the witness is first afforded an opportunity to explain or deny the prior inconsistent statement and the opposite party is afforded an opportunity to interrogate the witness on the prior inconsistent statement or the interests of justice otherwise require."); *Hood v. State*, 299 Ga. 95, 98-99 (2) (786 SE2d 648) (2016) (discussing § 24-6-613 (b) and noting that, because it "substantially adopted the language of Federal Rule of Evidence 613 (b) . . . , we look for guidance to the decisions of federal appellate courts, particularly

7. Finally, Womack contends that the cumulative effect of the trial court's errors warrants a new trial. In Divisions 4 through 6, supra, we concluded that the trial court did not err in denying Womack's motion for directed verdict, that the jury instructions read as a whole were not confusing, and that the trial court did not abuse its discretion in allowing Buckelew to impeach Womack's expert witness with a prior contradictory statement. Even assuming that all of the alleged errors should be considered cumulatively in this civil case, Womack "has failed to establish that the 'combined prejudicial effect' of these errors requires a new trial."[44]

*Judgment affirmed. Doyle, P. J., and Hodges, J., concur.*

---

the Eleventh Circuit, interpreting the federal rules[ ]"); *Wammock v. Celotex Corp.*, 793 F2d 1518, 1521-1523 (II) (11th Cir. 1986) (discussing the analogous federal rule 613 (b) and the requirement that the witness be given the opportunity to explain the contradiction).

[44] (Citation and punctuation omitted.) *Jones v. State*, 314 Ga. 605, 617 (5) (878 SE2d 505) (2022).